[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 17, 2004
THOMAS  K. KAHN
CLERK

———————————————

No. 03-14745

———————————————

D. C. Docket No. 02-00010-CV-JTC-3

STACY ALLEN DRAPER,

Plaintiff-Appellant,

versus

CLINTON D. REYNOLDS,
Deputy,

Defendant-Appellee.

———————————————

Appeal from the United States District Court
for the Northern District of Georgia

———————————————

**(May 17, 2004)**

Before EDMONDSON, Chief Judge, HULL, Circuit Judge, and EDENFIELD[*],
District Judge.

HULL, Circuit Judge:

---

[*] Honorable B. Avant Edenfield, United States District Judge for the Southern District of
Georgia, sitting by designation.

Plaintiff Stacy Allen Draper sued Defendant Deputy Sheriff Clinton D. Reynolds, individually, under 42 U.S.C. § 1983 and state law, for civil rights violations arising out of a traffic stop and arrest. The district court granted summary judgment for Reynolds on the federal claims and remanded the state law claims to state court. We affirm.

## I. Background

### A.    The Traffic Stop

At approximately 11:30 p.m. on July 19, 2001, Deputy Sheriff Clinton D. Reynolds ("Reynolds") stopped a tractor trailer truck (the "truck") driven by Plaintiff Stacy Allen Draper ("Draper"). While on patrol for the Sheriff's Office of Coweta County, Georgia, Reynolds observed Draper's truck traveling northbound on I-85 and stopped the truck allegedly because its tag light was not appropriately illuminated under Georgia law.

After Draper pulled his truck to the side of the interstate, Reynolds stopped his patrol car directly behind the truck. Reynolds on foot approached the passenger side of the truck cab, as was his practice in all roadside stops. When Reynolds reached the truck cab, the engine was running, the passenger window was closed, and the cab was illuminated briefly by an interior light but then became dark. Draper observed Reynolds at the passenger side and believed that

2

Reynolds was performing an inspection of the vehicle. From the passenger side, Reynolds shined his flashlight at the truck cab twice.

For summary judgment purposes, we accept Draper's version of what happened.[1] Draper was blinded by the flashlight the second time Reynolds shined it in the cab. Draper rolled down the passenger window and politely asked Reynolds to stop shining the flashlight at him. Reynolds then "said something like god dammit, you don't worry about what I'm doing over here." Draper again politely asked Reynolds to stop shining the light at him. Reynolds replied, "I told you to get your fucking ass over here two times." Draper then told Reynolds to get his "god darn flashlight" out of his eyes.

Reynolds then instructed Draper to meet him behind the truck, a location in view of a police camera that Reynolds had activated in his patrol car.[2] Reynolds also unholstered his TASER International ADVANCED TASER M26 ("taser

---

[1]We recite the facts in the light most favorable to Plaintiff Draper. See Vinyard v. Wilson, 311 F.3d 1340, 1343 n.1 (11th Cir. 2002). However, Reynolds hotly disputes Draper's version of the facts. Reynolds contends that he quickly "blinked" the flashlight into the cab twice in an attempt to "let [Draper] know that I was standing over there on the side for him to meet me over there, to know where I was at." According to Reynolds, Draper then rolled down the passenger window and said, "[W]hy the fuck are you shining that god damn flashlight in my eyes[?]"

[2]The police camera was located in Reynolds's car parked behind the truck. Because of the camera's location, the encounter at the truck cab is not clearly visible and no sound is heard. The police camera, however, recorded the actions and sound from the encounter behind the truck.

gun"),[3] which he kept in his hand through the remainder of the encounter. Draper got out of the truck cab and walked to the back of the truck.

The video camera in the patrol car recorded Draper's and Reynolds's speech and actions behind the truck.[4] Upon arrival behind the truck, Draper immediately began shouting and complaining about Reynolds's shining the flashlight in his face. Reynolds calmly asked Draper for his driver's license, but Draper continued to complain about Reynolds's prior use of the flashlight. Draper also insisted that he had done nothing wrong. During the encounter, Draper was belligerent, gestured animatedly, continuously paced, appeared very excited, and spoke loudly.

Reynolds repeatedly asked Draper to stop yelling and informed Draper that he would be taken to jail if he continued to yell. Reynolds told Draper that he also needed Draper's log book and bill of lading. Draper began to walk toward the truck cab while asking Reynolds if he needed anything else, but then turned

---

[3]Reynolds's taser gun is a Conducted Energy Weapon that uses propelled wire to conduct energy to a remote target, thereby controlling and overriding the body's central nervous system. The taser gun fires two probes up to a distance of twenty-one feet from a replaceable cartridge. These probes are connected to the taser gun by high-voltage insulated wire. When the probes make contact with the target, the taser gun transmits electrical pulses along the wires and into the body of the target, through up to two inches of clothing.

[4]See Appendix 1 for a transcript of the conversation between Draper and Reynolds at the back of the truck captured by the police video camera.

around and loudly accused Reynolds of harassing him. Reynolds replied that he needed Draper's license and insurance.

Draper handed his license to Reynolds and again began walking to the truck cab, but turned around when Reynolds told him for the second time to retrieve his bill of lading, proof of insurance, and log book. Draper still did not go to the truck cab but instead walked back toward Reynolds and accused him again of harassment.

For the third time, Reynolds told Draper to get the requested items, and Draper responded by exclaiming, "How 'bout you just go ahead and take me to fucking jail, then, man, you know, because I'm not going to kiss your damn ass because you're a police officer." Reynolds instructed Draper to calm down, but Draper protested loudly that he was calm. Reynolds explained that he believed Draper's actions were "threatening" and "putting [Reynolds] on the defensive."

For the fourth time, Reynolds told Draper to retrieve the requested documents. Draper did not move to the truck cab to get them and loudly complained that Reynolds was treating him like a "child" and disrespecting him. Reynolds replied that he had not disrespected Draper, and then he signaled to his back up, which had just arrived, with his flashlight. Draper continued to yell and accuse Reynolds of disrespecting him.

5

For the fifth time, Reynolds told Draper to retrieve the documents and then promptly discharged his taser gun at Draper's chest. Draper fell to the ground out of the police camera's view. Reynolds told Draper to stay on the ground and threatened to discharge the taser gun again if Draper did not comply. Reynolds then yelled to his back-up officer who had just arrived: "Handcuff this son of a bitch." Draper was handcuffed, searched, and placed in the back of the police car.[5] The police also searched Draper's truck at the arrest site.

After the other officers arrived and Draper was arrested, Reynolds stated to the officers that he thought Draper was going "to fight me" and that he pulled Draper over for a tag light violation. At the end of the video, the police camera focused on the area of the tag, while Reynolds again explained that he pulled Draper over for a tag light violation. Draper properly points out that at the end of the video, all of his truck's rear lights were turned off and were not shining, and thus the video does not establish conclusively that his tag light was out.

---

[5]While handcuffing Draper, one back-up officer placed a knee in Draper's back, which Draper claims forced a taser gun probe into his skin in the chest area. This back-up officer is not a defendant. Draper states that this area (approximately one quarter of an inch in size) became infected. Draper admits that he did not request medical treatment while in the Coweta County jail but still claims that Reynolds was deliberately indifferent to Draper's medical needs. Further, Draper raises this medical needs claim for the first time on appeal, and thus we consider it waived. See Ferrill v. Parker Group, Inc., 168 F.3d 468, 475 (11th Cir. 1999).

As noted in his incident report, Reynolds charged Draper with obstruction of an officer, in violation of Ga. Code Ann. § 16-10-24, and with having an improperly illuminated taillight, in violation of Ga. Code Ann. § 40-8-23.

## B. Procedural History

Draper filed suit against Reynolds individually in the State Court of Coweta County, Georgia under 42 U.S.C. § 1983 and state law. Draper's complaint contends that Reynolds improperly stopped him, falsely arrested him, and used excessive force in his arrest, all in violation of his constitutional rights and state law. Reynolds removed the case to the United States District Court for the Northern District of Georgia.

Draper then filed a "Motion to Disqualify United States District Court Judge Jack T. Camp as Judge in This Case," which the district court denied. Reynolds moved for summary judgment based on qualified immunity. The district court granted Reynolds's motion for summary judgment with regard to the federal claims. The district court remanded the state law claims to state court. Draper appeals the district court's grant of summary judgment and its denial of his disqualification motion.

## II. Standard of Review

We review de novo a district court's grant of summary judgment based on qualified immunity and apply the same legal standards as the district court. Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003). "We resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." Id.

We review for an abuse of discretion the district court's denial of a recusal motion. Byrne v. Nezhat, 261 F.3d 1075, 1100 (11th Cir. 2001); Jaffree v. Wallace, 837 F.2d 1461, 1465 (11th Cir. 1988).

### III. Discussion

#### A. Qualified Immunity

To determine whether Reynolds is entitled to qualified immunity, we apply a two-part inquiry. First, applying the facts in the light most favorable to Draper, we must ascertain whether Reynolds violated Draper's constitutional rights. See Saucier v. Katz, 533 U.S. 194, 200, 121 S. Ct. 2151, 2155 (2001); Vinyard v. Wilson, 311 F.3d 1340, 1346-47 (11th Cir. 2002); Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). Second, if we decide that a constitutional violation occurred, we then must determine whether the rights violated were "clearly

established." Vinyard, 311 F.3d at 1346; Lee, 284 F.3d at 1194. We thus begin by analyzing whether Reynolds violated Draper's constitutional rights.

**B.      Probable Cause for Traffic Stop**

Draper sues Reynolds for stopping his truck in violation of the Fourth Amendment. Draper contends that Reynolds's reason for stopping Draper – that the tag light on Draper's truck was not adequately illuminated – was pretextual. According to Draper, Reynolds stopped his truck because Draper was African American and Reynolds wanted to search vehicles for drugs with the hope of having vehicles forfeited to the Sheriff of Coweta County.

As the district court correctly noted, the Supreme Court and this Court previously rejected the use of such pretextual-stop analysis and concluded that ulterior motives will not invalidate police conduct based on probable cause to believe a violation of the law occurred. Whren v. United States, 517 U.S. 806, 812-13, 116 S. Ct. 1769, 1774 (1996); United States v. Holloman, 113 F.3d 192, 194 (11th Cir. 1997). Indeed, this Court in Holloman rejected a very similar pretextual-stop argument. 113 F.3d at 194. In Holloman, a St. Petersburg, Florida detective stopped Holloman's pickup truck because the truck's tag light was not properly illuminated under Florida law. Id. at 193. Under the St. Petersburg police department's drug interdiction operation, after a vehicle was stopped for a

traffic violation, the detectives either would conduct a consensual search of the vehicle or would summon a narcotics detection canine to sniff the exterior of the vehicle. Id. After Holloman refused to consent to a search, a narcotics canine sniffed his vehicle and alerted to drugs, which were found in the vehicle. Id. Holloman was indicted with possession and intent to distribute narcotics. Id. at 193-94. Holloman moved to suppress the evidence of drugs, arguing that the traffic stop was "'unreasonably pretextual and unconstitutional.'" Id. at 194.

This Court in Holloman noted that the Supreme Court's decision in Whren "squarely rejected the pretextual stop analysis that had prevailed previously in the Eleventh Circuit." Id. This Court explained that, under Whren, "the constitutional 'reasonableness' of a traffic stop must be determined irrespective of 'intent,' whether of the particular officer involved or of the theoretical 'reasonable officer.'" Id. (quoting Whren, 517 U.S. at 811-16, 116 S. Ct. at 1773-76). We further explained that Whren "conclusively refutes the notion that ulterior motives may invalidate police conduct that is justified on the basis of probable cause to believe that a violation of law has occurred." Id. at 194. In Holloman, this Court concluded that because the detectives "possessed probable cause to believe that a traffic violation had occurred," the stop complied with the Fourth Amendment regardless of their desire to intercept drugs.

10

Thus, the only question for purposes of examining the constitutionality of Reynolds' stop is: Did Reynolds have probable cause to believe that a traffic violation had occurred? Under Georgia law, a tag must be illuminated with a white light so that it is legible from fifty feet to the rear. Ga. Stat. Ann. § 40-8-23.[6] At his deposition, Reynolds testified that he stopped Draper because he observed that Draper's tag light was out. At his deposition, Draper testified that he picked up his truck at the wrecker yard between eleven a.m. and noon the next day and that his tag light was working. That the tag light was working to an unknown extent during daylight does not directly contradict Reynolds's position that the registration plate was not clearly legible from fifty feet away on the night of the stop and is insufficient to create a genuine issue of material fact in this record. We thus conclude that Reynolds had probable cause to stop Draper's truck.[7]

---

[6]Section 40-8-23 states in relevant part:

Either a taillight or a separate light shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of 50 feet to the rear. Any taillight or taillights, together with any separate light for illuminating the rear registration plate, shall be so wired as to be lighted whenever the headlights or auxiliary driving lights are lighted.

Ga. Code. Ann. § 40-8-23(d).

[7]Given our conclusion that Reynolds had actual probable cause and no constitutional violation occurred, we need not discuss the arguable probable cause doctrine and whether a law enforcement officer reasonably could have believed that probable cause existed for purposes of determining the second prong of the qualified immunity test. See Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003); Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997). "Even law

**C.     Probable Cause to Arrest Draper**

Even if the stop was constitutional, Draper contends that Reynolds violated

his Fourth Amendment rights by arresting him.  Probable cause to arrest exists

"'when the facts and circumstances within the officer's knowledge, of which he or

she has reasonably trustworthy information, would cause a prudent person to

believe, under the circumstances shown, that the suspect has committed, is

committing, or is about to commit an offense.'" Durruthy, 351 F.3d at 1088

(quoting McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir.

2003)).  As discussed earlier, Reynolds had probable cause to stop Draper for a tag

light violation, and that probable cause was also sufficient to permit Reynolds to

arrest Draper for that violation.  Thus, we now focus on the obstruction-of-justice

charge.[8]

Under Georgia law, it is unlawful to knowingly and willfully obstruct or

hinder any law enforcement officer in the lawful discharge of his official duties.

---

enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991) (citation omitted); Holmes, 321 F.3d at 1079 (quoting Hunter); Montoute, 114 F.3d at 184 (same).

[8]The parties do not dispute that a custodial arrest may be made for both a misdemeanor offense and traffic violations.  See Atwater v. City of Lago Vista, 532 U.S. 318, 355, 121 S. Ct. 1536, 1557 (2001).

12

Ga. Code Ann. § 16-10-24(a).[9] The undisputed facts in this case show that at least five times Reynolds instructed Draper to retrieve certain relevant documents. Each time Reynolds requested these items, Draper failed to comply with the request. Instead, Draper accused Reynolds of harassing him and even yelled at Reynolds, "How 'bout you just go ahead and take me to fucking jail . . . ." Draper acted in a confrontational and agitated manner, paced back and forth, and repeatedly yelled at Reynolds while they were at the back of the truck. By repeatedly refusing to comply with Reynolds's reasonable instructions, and by acting belligerently and confrontationally, Draper hindered Reynolds in

---

[9]Section 16-10-24(a) states in relevant part: "[A] person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor." Ga. Code Ann. §16-10-24(a).

completing the traffic stop.[10]  Thus, Reynolds had ample probable cause to arrest

Draper for violating Ga. Code Ann. § 16-10-24.[11]

## D.    Excessive Force

Draper also asserts that Reynolds used excessive force in effectuating the

arrest by discharging a taser gun at Draper's chest.  Draper argues that Reynolds

did not need to use any force in arresting him because Draper gladly would have

---

[10]For examples of the application of § 16-10-24(a), see Evans v. State, 250 Ga. App. 70, 71, 550 S.E.2d 118 (2001) ("This court has previously held that certain verbal exchanges between a defendant and officers can authorize a conviction for misdemeanor obstruction."); Pinchon v. State, 237 Ga. App. 675, 676, 516 S.E.2d 537 (1999) ("Argument, flight, stubborn obstinance, and lying are all examples of conduct that may satisfy the obstruction element."); Johnson v. State, 234 Ga. App. 218, 507 S.E.2d 13 (1998) (affirming obstruction conviction where defendant refused to obey police officer's command to exit vehicle); Carter v. State, 222 Ga. App. 397, 397-98, 474 S.E.2d 228 (1996) (concluding that whether defendant's making "loud, unruly statements and using profane language" when police questioned her in her home constituted misdemeanor obstruction was a question for the trier of fact); Duke v. State, 205 Ga. App. 689, 689-90, 423 S.E.2d 427 (1992) (concluding that misdemeanor obstruction does not require "evidence of forcible resistence or opposition"); Hall v. State, 201 Ga. App. 328, 411 S.E.2d 274 (1991) (refusing to produce drivers' license and beginning to walk towards car were sufficient for obstruction conviction); Bailey v. State, 190 Ga. App. 683, 683-84, 379 S.E.2d 816 (1989) (stating that defendant's refusal to identify himself was not merely discourteous but was sufficient for obstruction conviction).

[11]Draper also argues that Reynolds violated his First Amendment right to freedom of speech because Reynolds arrested him for proclaiming his innocence.  Draper's claim is without merit because Reynolds had probable cause to arrest Draper regardless of Reynolds's motivation. See Dahl v. Holley, 312 F.3d 1228, 1236 (11th Cir. 2002) ("Whatever the officers' motivation, however, the existence of probable cause to arrest [the plaintiff] defeats her First Amendment claim.").  Further, Draper's claim in the district court that the inventory search of his truck was unconstitutional is not raised as an issue on appeal, and thus we do not address it.

14

complied with Reynolds's arrest requests if Reynolds had just verbally told him he was under arrest.[12]

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee, 284 F.3d at 1197 (citing Graham v. Connor, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 1871 (1989)).  A court looks to the "totality of circumstances" to determine whether the manner of arrest was reasonable.  See Tennessee v. Garner, 471 U.S. 1, 8-9, 105 S. Ct. 1694, 1700 (1985).  "[I]n determining if force was reasonable, courts must examine (1) the need for the application of force,[13] (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted."  Lee, 284 F.3d at 1198 (citing Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir. 1986)); see also Vinyard, 311 F.3d at 1347.  It is well settled that the right to make an arrest "necessarily carries

---

[12]Draper also asserts in passing that excessive force was used in handcuffing him and in placing him in the police car.  However, his brief on appeal fails to argue the merits of these claims, and we view them as waived. See Chavis v. Clayton County Sch. Dist., 300 F.3d 1288, 1291 n.4 (11th Cir. 2002) (citing Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1987) (stating that "issues not argued on appeal are deemed waived, and passing reference in an appellate brief is insufficient to raise an issue")).  To the extent that these claims are not waived, they lack merit in any event.

[13]As this Court recently explained in Lee v. Ferraro, the need for the application of force is measured by this test: "the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight."  284 F.3d at 1198 (interpreting Graham).

15

with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396, 109 S. Ct. at 1871-72; Vinyard, 311 F.3d at 1347; Lee, 284 F.3d at 1197. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97, 109 S. Ct. at 1872.

In the circumstances of this case, Reynolds's use of the taser gun to effectuate the arrest of Draper was reasonably proportionate to the difficult, tense and uncertain situation that Reynolds faced in this traffic stop, and did not constitute excessive force. From the time Draper met Reynolds at the back of the truck, Draper was hostile, belligerent, and uncooperative. No less than five times, Reynolds asked Draper to retrieve documents from the truck cab, and each time Draper refused to comply. Rather, Draper accused Reynolds of harassing him and blinding him with the flashlight. Draper used profanity, moved around and paced in agitation, and repeatedly yelled at Reynolds. Because Draper repeatedly refused to comply with Reynolds's verbal comments, starting with a verbal arrest command was not required in these particular factual circumstances. More importantly, a verbal arrest command accompanied by attempted physical

16

handcuffing, in these particular factual circumstances, may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either Draper or Reynolds would be seriously hurt. Thus, there was a reasonable need for some use of force in this arrest.

Although being struck by a taser gun is an unpleasant experience, the amount of force Reynolds used – a single use of the taser gun causing a one-time shocking – was reasonably proportionate to the need for force and did not inflict any serious injury. Indeed, the police video shows that Draper was standing up, handcuffed, and coherent shortly after the taser gun stunned and calmed him. The single use of the taser gun may well have prevented a physical struggle and serious harm to either Draper or Reynolds. Under the "totality of the circumstances," Reynolds's use of the taser gun did not constitute excessive force, and Reynolds did not violate Draper's constitutional rights in this arrest.[14]

## E.    Recusal Motion

---

[14]Draper also argues that Reynolds violated his Fourteenth Amendment rights to equal protection and substantive due process. To state an equal protection claim, Draper must allege that "through state action, similarly situated persons have been treated disparately," Thigpen v. Bibb County Sheriff's Dep't., 223 F.3d 1231, 1237 (11th Cir. 2000), and put forth evidence that Reynolds's actions were motivated by race. See Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 265-66, 97 S. Ct. 555, 563 (1977). Draper presented no evidence that Reynolds treated white truck drivers differently from African-American truck drivers and no evidence showing that Reynolds's actions were motivated by race.

Plaintiff Draper also appeals the district court's denial of his motion seeking its recusal under 28 U.S.C. § 455 and 28 U.S.C. § 144. The bases for Draper's motion are: (1) Draper's counsel's previous involvement in a case before Judge Camp, in which Judge Camp reduced the attorney's fees sought by Draper's counsel; (2) Judge Camp's ownership interest in certain property located in Coweta County, Georgia, for which Judge Camp previously filed and subsequently withdrew an application seeking zoning reclassification; (3) Judge Camp's previous membership in the Glover & Davis law firm, a member of which now serves as the Coweta County Attorney; and (4) Judge Camp's alleged general bias in favor of governmental attorneys and Coweta County, and against African American litigants. The district court properly denied Draper's motion.

**1.      Section 455**

Draper argues that Judge Camp's presiding over his case violates 28 U.S.C. §§ 455(a), (b)(1), (b)(4), and (b)(5). Section 455 provides, in relevant part:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which <u>his impartiality might reasonably be questioned</u>.
> (b) He shall also disqualify himself in the following circumstances:
>> (1) Where he has a <u>personal bias or prejudice concerning a party</u>, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>>         . . . .

18

(4) He knows that he, individually or as a fiduciary, . . . has a <u>financial interest in the subject matter</u> in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding; (5) He or his spouse . . . [i]s known by the judge to <u>have an interest that could be substantially affected by the outcome</u> of the proceeding . . . .

28 U.S.C. § 455 (emphasis added).

First, Draper asserts that Judge Camp's reduction of his attorney's fees in a previous case establishes bias against Draper's counsel, requiring recusal under §§ 455(a) and (b)(1). The United States Supreme Court has instructed that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." <u>Liteky v. United States</u>, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994). <u>Liteky</u> makes clear that a judge's decision to "benefit" one party over another in a previous judicial proceeding, without more, can never form the basis of a § 455(a) recusal motion unless the decision displays a "deep-seated favoritism or antagonism that would make fair judgment impossible." <u>Id</u>. Draper has cited no facts indicating that Judge Camp's reduction of Draper's counsel's fees evinces such favoritism or antagonism. We further note that "bias against a lawyer, even if found to exist, without more is not bias against his client." <u>In re Drexel Burnham Lambert Inc.</u>, 861 F.2d 1307, 1314 (2d Cir. 1988). Thus, Judge Camp's previous ruling clearly does not require recusal under § 455(a) or (b)(1).

19

Second, Draper argues that Judge Camp's ownership interest in real property located in Coweta County requires his disqualification under §§ 455(a), (b)(4), and (b)(5). Draper asserts that Judge Camp seeks to curry favor with Coweta County and the Coweta County Commissioners because (1) he filed a zoning application in the past and (2) at some point he may file another zoning application that, if granted, would increase the value of his real property.

We conclude that Judge Camp's ownership interest in property in Coweta County does not require recusal unless Coweta County and the Coweta County Commissioners are parties to the case <u>and</u> unless his zoning application is currently pending before Coweta County and the Coweta County Commissioners. Because Coweta County and the Coweta County Commissioners are not parties to this case, Judge Camp was not required to recuse because of his ownership interest in property in Coweta County.

We note that our conclusion is consistent with that reached by the Committee on the Codes of Conduct of the Judicial Conference of the United States. The Committee addressed a similar situation under Canon 3C of the Code of Conduct for United States Judges, which contains language almost identical to

the relevant provisions of § 455.[15]  The Committee advised that a judge who is

seeking action from a city zoning commission should recuse from cases involving

the zoning commission.  Guide to Judiciary Policies and Procedures, Vol. II, Ch.

V, Compendium § 3.6-1(e) (2003).  The Committee also advised, however, that

recusal was not required in cases involving the city or its other agencies unless an

appeal from the zoning commission was taken to the city council; in that case, the

judge would be required to recuse from cases in which the city was a party.  Id.

The Committee further advised that a judge who has a dispute with a city agency

should recuse for a reasonable time after the dispute is fully resolved.  Id.

   This Court is not bound by the opinions of the Committee on Judicial Codes

of Conduct.  In the past, however, courts have considered those opinions to some

---

[15]Canon 3C(1) provides, in relevant part:
(1) A judge shall disqualify himself or herself in a proceeding in which the judge's
impartiality might reasonably be questioned, including but not limited to instances
in which:
>    (a) the judge has a personal bias or prejudice concerning a party . . .;
>    . . . .
>    (c) the judge knows that the judge . . . has a financial interest in the
>    subject matter in controversy or in a party to the proceeding, or any
>    other interest that could be affected substantially by the outcome of
>    the proceeding;
>    (d) the judge . . .
>>        (iii) is known by the judge to have an interest that
>>        could be substantially affected by the outcome of the
>>        proceeding . . . .
Code of Conduct for United States Judges Canon 3C(1) (2003).

extent.[16]  In this case, the line drawn by the Committee appropriately balances the need for recusal where a judge's impartiality might <u>reasonably</u> be questioned with the need to discourage litigants from presenting "speculative and ethereal arguments for recusal and thus arrogat[ing] to themselves a veto power over the assignment of judges."  <u>Thomas v. Trs. for Columbia Univ.</u>, 30 F.Supp. 2d 430, 431 (S.D.N.Y. 1998); <u>see also</u> <u>Gas Utils. Co. v. Southern Natural Gas Co.</u>, 996 F.2d 282, 283 (11th Cir. 1993) (concluding that a "'remote, contingent, and speculative interest is not a financial interest within the meaning of the recusal statute . . . nor does it create a situation in which a judge's impartiality might reasonably be questioned'") (quoting <u>In re Placid Oil Co.</u>, 802 F.2d 783, 786 (5th Cir. 1986)).

Although Coweta County and the Coweta County Commissioners are not parties to this case, Draper also alleges that Coweta County has a financial interest in the outcome of the litigation because it purchased an insurance policy that provides law enforcement liability coverage, which has a $25,000 deductible. Under some circumstances, a judge's interest in a non-party with a financial

---

[16]<u>See</u> <u>Union Carbide Corp. v. U.S. Cutting Service, Inc.</u>, 782 F.2d 710, 715 (7th Cir. 1986) ("In matters of judicial ethics we are bound to give some weight to the view of the committee of judges that the Judicial Conference of the United States has established to advise federal judges on ethical questions."); <u>see also</u> <u>Weingart v. Allen & O'Hara, Inc.</u>, 654 F.2d 1096, 1107 (5th Cir. 1981) (citing committee advisory opinions regarding recusal in addressing § 455 recusal issue).

interest in a case may require the judge's recusal from that case. See Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 867-68, 108 S. Ct. 2194, 2206 (1988) (concluding that judge who was a trustee of a university was required to recuse from case in which the university had an interest, although the university was not a party). However, there is no showing by Draper that Coweta County would pay the deductible, as Officer Reynolds is sued in his individual capacity and works for the Coweta County Sheriff's Department and not the Coweta County Commissioners. In any event, even assuming Draper has established that Coweta County somehow has an indirect financial interest in the outcome of this case, he has made no showing that the Coweta County Commissioners have any interest. Even if both Coweta County and the Coweta County Commissioners have an indirect financial interest in this case, Judge Camp's recusal still would not be required because his zoning application was withdrawn prior to the filing date of this case, and the filing of any future zoning application is entirely speculative.[17]

Third, there is no merit in Draper's assertion that Judge Camp's previous affiliation with the Glover & Davis law firm suggests bias. Although Asa Powell,

---

[17]In addition, Judge Camp's general interest as a resident, taxpayer, and property owner in Coweta County does not require recusal in cases where Coweta County or the Coweta County Commissioners are not parties. See In re Houston, 745 F.2d 925, 929-30 (5th Cir. 1984).

the current Coweta County Attorney, is a member of that firm, Judge Camp has not been affiliated with Glover & Davis for over 15 years.[18]  Accordingly, Judge Camp's impartiality could not reasonably be questioned on that basis.

Finally, Draper asserts in effect that Judge Camp is a racist.  Draper sets forth no facts to support these allegations.  Draper's unsupported, inflammatory allegations alone would not cause a reasonable person to question Judge Camp's impartiality and do not entitle him to a new judge.

## 2.    Section 144

Draper also asserts that Judge Camp was disqualified under 28 U.S.C. § 144.  Section 144 provides, in relevant part:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

28 U.S.C. § 144 (emphasis added).  Draper's motion to disqualify Judge Camp under § 144 fails for the same reasons it fails under § 455.  Draper presents no evidence that Judge Camp harbored a "personal bias or prejudice either against

---

[18]The fact that Asa M. Powell, the current Coweta County Attorney, joined Davis & Glover in 1992 – three and a half years after Judge Camp left the law firm in 1988 – makes this argument even more frivolous.  Further, assuming that a judge is no longer receiving financial payment from a former law firm, a two-year recusal period is generally reasonable.  Guide to Judiciary Policies and Procedures, Vol. II, Ch. V, Compendium § 3.3-1(b) (2003).

24

him or in favor of any adverse party." 28 U.S.C. § 144. Thus, the district court did not err in denying Draper's motion to disqualify the district court judge.[19]

## IV. Conclusion

For all these reasons, we affirm the district court's grant of summary judgment in favor of Reynolds on Draper's federal claims, its remand of Draper's state law claims to the state court, and its denial of Draper's motion to disqualify the district court judge.

**AFFIRMED.**

---

[19]Draper also seems to assert that Judge Camp is disqualified because he wrote a letter to the Coweta County Attorney on June 19, 2002. In the letter, Judge Camp explained that he previously had recused himself from cases involving the Coweta County Commissioners during the pendency of his zoning application. Judge Camp's letter further explained that his zoning application was no longer pending, that he did not intend to seek a change in the zoning classification of his property in the future, and that, as a result, he did not intend to recuse from further cases involving the Commissioners, and asked that Attorney Powell discuss this information with his client and let him know if either he or his client objected. Nothing in this letter requires Judge Camp's disqualification.

Appendix 1

Draper: [Inaudible] Man, I don't know.  I can't see no more.

Reynolds: Got your driver's license?

Draper: Yeah.  I got my driver's license.

Reynolds: What's wrong?

Draper: Man, you're shining and blinding me, you know . . . . [Inaudible]

Reynolds: I'm shining at you to come out.

Draper: You ain't saying nothing.  You just . . . .

Reynolds: You got the window up.

Draper: Whatever.  Of course I can't.  All I see is somebody standing there.

Reynolds: Look, you got the wrong answers out here, sir.

Draper: No I don't . . . [Inaudible] I just got . . . [Inaudible] in my eyes . . .

Reynolds: Quit yelling at me.  Quit yelling at me.

Draper: I ain't doing nothing wrong.  I'm just going down the road, minding my own business.

Reynolds: You don't know why I stopped you.  And if you keep yelling at me, you're going to be in jail.

Draper: Oh, for what?  Now I'm going to go to jail for what?

Reynolds: Cause of the way you're acting out here . . .

Draper: Answer my question.

Reynolds: . . . You're not going to sit here and yell at me, sir.  I'm going to tell you that right now.

Draper: Oh, but you'll let another guy . . . [Inaudible] with a . . . I ain't even going to go there . . . [Inaudible] all right . . . here . . .

Reynolds: Now I need your log book.  I need your bill of lading.

Draper: [Begins to walk toward truck cab, then turns back.] You need anything else?  I don't know why you're harassing me.  You're, first of all, I guess you're . . . [Inaudible]

Reynolds: Let me see your driver's license and your insurance.

Draper: . . . Picking on me or something . . . I don't know . . . [Inaudible] Maybe, what . . . [Inaudible] I don't know what your problem is . . . [Inaudible]

Reynolds: Sir, you need to go get your bill of lading and your proof of insurance. And bring it back to me.  I also need your log book.

Draper: I think this is . . . [Inaudible]

Reynolds: I also need your log book, sir.

Draper: [Inaudible] . . . I'll bring everything you need, okay?

Reynolds: Sir, you're going to.  Thanks.

Draper: Oh, I know, and I will.  But I don't understand what your problem is with me.  You see, because I think you're harassing me.

Reynolds: I think you need to go get what I asked you to get, sir.

Draper: How bout you just go ahead and take me to fucking jail, then, man, you know, because I'm not going to kiss your damn ass because you're a police officer.  I'm a law abiding . . . [Inaudible]

Reynolds: You need to calm down, sir.

Draper: I am calm.  I am calm.

Reynolds: No you're not.

Draper: I am calm.

Reynolds: No you're not.  You're . . . [Inaudible] yelling at me and you're threatening me.

Draper: No, I'm not threatening you . . . [Inaudible] Why you saying I'm threatening you?  Did I say I was going to hurt you or something?

Reynolds: You ain't going to.  I'm not worried about that.

Draper: [Inaudible]

Reynolds: Cause of the way you're acting.  You're putting me on the defensive.

Draper: How am I acting? I'm . . . [Inaudible]

Reynolds: I asked you to go get what I asked you to get, sir.

Draper: [Inaudible] . . . talking to me as if I'm a little child or something . . . [Inaudible] That's what I'm talking about . . . [Inaudible] have no respect for the public out here or something . . . [Inaudible]

Reynolds: I haven't disrespected you, sir.

Draper: You did.  You . . . [Inaudible] shining a light in my face . . .

Reynolds: Sir . . .

Draper: . . . get out of the truck . . .

Reynolds: Go get what I asked you to get now, sir.