[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-17639
_____

D.C. Docket No. 6:15-cv-00807-PGB-DCI

MICHAEL MONTANEZ,

Plaintiff - Appellee,

versus

JORGE CARVAJAL, TODD RAIBLE, et. al.,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 9, 2018)

Before ED CARNES, Chief Judge, NEWSOM, and SILER,[*] Circuit Judges.

NEWSOM, Circuit Judge:

Police officers interrupt what they reasonably believe to be a residential

burglary and detain two suspects just outside the house.  Having done so, can the

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

officers thereafter lawfully enter the home—without a warrant, and without further suspicion of wrongdoing—to briefly search for additional perpetrators and potential victims?  We hold that they can.  In particular, we hold that the suspected burglary presents an "exigent circumstance" that justifies a warrantless entry and search.

## I

On a springtime afternoon in 2011, Officer Todd Raible of the Volusia (Florida) County Sheriff's Office was driving his unmarked patrol car through a neighborhood that had been experiencing a rash of daytime burglaries.  As he drove, Raible, a property-crimes investigator who knew all about the recent uptick in theft, took note of a young man—later identified as William Rivera—who was standing on the sidewalk in front of the residence at 1127 West New York Avenue and who appeared to be looking around nervously while talking on a cell phone.  Raible became suspicious of Rivera, who Raible said "seemed anxious" and "kind of hunched" as he paced up and down in front of the house.  Raible's suspicions deepened when, as he watched, Rivera walked down a side street toward the back of the dwelling.

As Raible observed Rivera approach the back door, he saw another young man—later identified as Troy Copeland—"huddling" nearby.  Based on his experience, Raible was convinced that Copeland was positioning himself to act as

2

a "lookout" while Rivera broke into the house.  Given everything he had seen,

Raible radioed for backup, describing the unfolding situation as a "burglary in

progress."

Driving his own patrol car, Officer Jorge Carvajal heard and responded to

Raible's request for backup.  Raible and Carvajal met at a nearby gas station and

quickly formulated a plan for approaching the suspects.  After talking to Carvajal,

Raible returned to the house, where Rivera and Copeland remained near the back

door; Raible parked his car and exited with his gun drawn.  Carvajal soon joined

Raible and drew his weapon as well, and the two officers ordered Rivera and

Copeland to the ground, where they placed them in handcuffs.[1]

Once Rivera and Copeland were cuffed, Raible entered the home's back

door and stepped through a small vestibule to a second door, which led to the

home's interior and was slightly ajar.  Without crossing the threshold, Raible

leaned through the second door and shouted, "Sheriff's office, come out if

---

[1] Although not disputing what Raible and Carvajal saw, Rivera and Copeland explained the underlying events as follows:  They both lived at 1127 West New York Avenue with the home's co-owner (and appellee here) Michael Montanez.  In the moments leading up to the confrontation with the police, Rivera had been inside making a sandwich when he received a telephone call from his cousin inviting him to travel to New Jersey for a visit.  He stuffed a knife that he was using into his pocket and walked outside to get a better cell signal.  The nervousness and anxiousness that Raible observed, Rivera said, was actually excitement about the prospect of traveling out-of-state for the first time.  Indeed, Rivera testified that he was so psyched up that he needed a cigarette, which he had to retrieve from a music studio just inside the house's back door—hence, he explained, his trip around the dwelling's perimeter.  Copeland claimed that he had been in the studio, and that when Rivera came in to tell him about New Jersey—and his urge to smoke—the two stepped outside, where, shortly thereafter, they were confronted by Raible and Carvajal.

3

anybody's in there, sheriff's office." Hearing no answer after about 10 seconds, Raible went back outside.

Raible and Carvajal then searched Rivera and Copeland and discovered that Rivera had two kitchen knives in his pants pockets. The knives were significant, Raible thought, because near the handle on the house's back door he also observed pry marks, which he believed to be both fresh and consistent with having been made by knives. The officers asked Rivera and Copeland for identification; neither ID listed 1127 West New York Avenue as a home address. Given the indications that the back door had recently been pried open using tools like the knives found on Rivera and that each of the suspects' IDs listed another home address, Raible and Carvajal concluded that they had interrupted an ongoing burglary. At that point, the officers formally arrested Rivera and Copeland.

Additional officers soon arrived on the scene. Once they gathered in sufficient number, Carvajal entered the home's main structure along with Officers Kyle Bainbridge, Edward Hart, and Julio Rodriguez to check (as each of the officers explained) "for additional perpetrators or potential victims." This second entry—which was the first into the home's interior and which the officers described as a "sweep"—lasted about four minutes. Importantly for our purposes, during the second entry, the officers saw in plain view what they believed to be marijuana and associated drug paraphernalia.

Almost immediately thereafter, Officers Carvajal, Bainbridge, and Hart took their supervisor, Lieutenant Brian Henderson, into the house to show him the marijuana and paraphernalia. This third entry lasted about two minutes. After viewing the suspected contraband, Henderson called the West Volusia Narcotics Task Force to determine whether a search warrant should be obtained for the remainder of the dwelling. Henderson, Carvajal, Bainbridge, and Hart then re-entered the house once again—for a fourth time—staying for a little more than two minutes.

Half an hour later, Cecelia Gregory, Montanez's mother and co-owner of the house, showed up and (fifth entry) was escorted inside by Henderson. An hour after that, task-force investigators David Clay and David McNamara arrived and (sixth) went into the home with Raible to view the marijuana and drug paraphernalia.[2]

Based on the contraband shown to him during the sixth entry, McNamara swore out an affidavit in support of a search warrant, which an assistant state attorney approved and a circuit court judge then signed. Warrant in hand, the officers subsequently conducted a full search of the house, which yielded $18,500 in U.S. currency as well as miscellaneous drugs and drug paraphernalia.

---

[2] Each of the officers' six entries was captured on the home's video surveillance system.

As it turns out, the authorities never filed any charges against Rivera, Copeland, or Montanez pertaining to the drugs or the associated paraphernalia— apparently because they couldn't figure out whose they were. It was later determined, as well, that the money lawfully belonged to Montanez.

Rivera, Copeland, and Montanez sued the officers in state court. After the officers removed the case to federal court, Rivera, Copeland, and Montanez filed a multicount amended complaint that alleged both state tort claims and (under 42 U.S.C. § 1983) the following Fourth Amendment claims: Rivera and Copeland brought unreasonable-seizure and false-arrest claims against Raible, and Montanez brought unlawful-entry and unreasonable-search claims against all of the officers. After the district court dismissed the state-law and false-arrest claims at the pleadings stage, the officers moved for summary judgment on the remaining counts based on qualified immunity. The district court granted Raible summary judgment on Rivera's and Copeland's claims arising out of their arrests but denied the officers' motion on Montanez's claims arising out of the multiple searches of his house.

In this interlocutory appeal of the district court's denial of their summary judgment motion, the officers contend that the first two warrantless entries into Montanez's residence—Raible's initial 10-second entry announcing the police's presence and the officers' ensuing four-minute sweep of the house—were justified

6

by "exigent circumstances," or at the very least that no binding precedent "clearly established" (for qualified-immunity purposes) that those searches were invalid. The officers further contend that if the first two entries into the house were lawful, then the remaining entries—to observe the marijuana and associated paraphernalia spotted in plain view during the second entry—were likewise permissible on the ground that they didn't violate any surviving privacy interest.

## II

We review the denial of summary judgment based on an assertion of qualified immunity *de novo*, applying the same legal standards as the district court. *Draper v. Reynolds*, 369 F.3d 1270, 1274 (11th Cir. 2004).  "We resolve all issues of material fact in favor of the plaintiff, and then determine the legal question [] whether the defendant is entitled to qualified immunity under that version of the facts."  *Id*. (quoting *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003)).

To avoid personal liability for alleged constitutional torts, law-enforcement officers may invoke the defense of qualified immunity.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity shields government officials from individual-capacity suits for actions taken while performing a discretionary function so long as their conduct does not violate a "clearly established" constitutional right.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

7

Because it's clear here that the officers were acting within the scope of their discretionary authority at all relevant times, in order to defeat qualified immunity Montanez has to show both (1) that the officers violated his constitutional rights and (2) that those rights were clearly established at the time of the searches in question. *See Pearson*, 555 U.S. at 232. We hold that the officers are entitled to qualified immunity at step one (so to speak) because their actions didn't violate the Fourth Amendment.

We divide our analysis into two parts, each of which turns on the application of a distinct constitutional principle. First, and most significantly, we must decide whether Raible's initial entry into the vestibule and the officers' ensuing four-minute sweep of the home's main structure complied with the Fourth Amendment. As explained below, we conclude that those entries—during the second of which the officers saw the marijuana and associated drug paraphernalia in plain view—were justified by the "exigent circumstances" created by the suspected burglary. Second, we must decide whether the officers' subsequent entries to re-see (and re-see and re-see) the contraband were permissible. We hold that they were because they didn't violate any reasonable expectation of privacy that survived the first two (valid) searches.

**A**

The Fourth Amendment, which applies to state and local governments through the Fourteenth, *see Mapp v. Ohio*, 367 U.S. 643, 655 (1961), provides that—

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  By its terms, the Fourth Amendment imposes two discrete limitations.  The first clause establishes a baseline requirement that all searches and seizures—including, as relevant here, of "houses"—must be "reasonable."  The second specifies that a warrant, where issued, must be supported by probable cause and a particularized description.

Although the Fourth Amendment's text doesn't prescribe the circumstances in which a warrant is necessary, the Supreme Court has long held that because of the home's privileged place in the constitutional order, "searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980); *see also, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (describing protection of the home as "'the very core' of the Fourth Amendment" (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961))).  "Nevertheless," the Court has clarified, "because the ultimate touchstone of the

9

Fourth Amendment is 'reasonableness,' the warrant requirement" that ordinarily applies to home searches "is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

"One such exception"—at issue here—"is that the police may enter a private premises and conduct a search if 'exigent circumstances' mandate immediate action." *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002). In such cases, a warrantless search "may be legal when there is compelling need for official action and no time to secure a warrant"—or, phrased a bit differently, when "resort to a magistrate for a search warrant is not feasible or advisable." *Id.* (internal citation and quotation omitted). The bottom line, as explained by the Supreme Court in a recent exigent-circumstances case, is that "warrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement." *Kentucky v. King*, 563 U.S. 452, 462 (2011).

The principal question here is whether exigent circumstances justified—and thus rendered "reasonable"—the officers' first two warrantless entries into Montanez's house. We conclude that they did. In particular, we hold that if police have probable cause to suspect a residential burglary—whether they believe the crime is currently afoot or has recently concluded—they may, without further

10

justification, conduct a brief warrantless search of the home to look for suspects and potential victims.

**1**

Our starting point is *United States v. $291,828.00 in U.S. Currency*, 536 F.3d 1234 (11th Cir. 2008).  In that case, a homeowner who was out of town got a call from his home-security company alerting him that his burglar alarm had been set off and asking whether the police should be dispatched to investigate.  He answered yes, and when the police arrived they conducted two warrantless "sweeps" of the house to search for suspects, looking only in places "where a person could be found."  *Id.* at 1235–36, 1238.  During the second sweep, the officers saw contraband in plain view, which they seized, and which the homeowner later moved to suppress as the fruit of an unlawful warrantless search. We rejected the homeowner's argument and held that, pursuant to the exigent-circumstances doctrine, police officers investigating a suspected burglary may conduct a warrantless search of a dwelling to look for "intruder[s]."  *Id*. at 1238.[3]

Notably, in *$291,828.00*, we expressly declined the homeowner's request that we draw certain "bright line[s]" specifying when burglary-related exigent circumstances do and don't exist—in particular there, we rejected his contention

---

[3] We declined to consider whether the homeowner's request that the police investigate the burglary constituted "consent" sufficient to validate the search because, we found, that issue was not properly presented.  *Id*. at 1238 n.2.

11

that the exigencies in that case "instantaneously cease[d]" when the lead officer exited the house between the first and second sweeps. *Id.* Instead, we deferred to what we called the police officers' "fairly perceived need to act on the spot." *Id.* The same sort of deference is appropriate here.

The district court seemed to think it conclusive that Officer Raible "had just detained two individuals who he believed were working in tandem"—Rivera and Copeland—and (the court said) "had no reason to believe anyone else was involved." Contrary to the district court's suggestion, though, the exigencies facing a police officer who happens upon a suspected burglary don't evaporate—or as we said in *$291,828.00*, "instantaneously cease"— simply because he has located and detained one or more suspected perpetrators. For one thing, a responding officer will rarely know (or have any real way of knowing) whether he's rounded up everybody—burglars frequently work in groups, and without a quick look around, he can't be sure that additional perpetrators aren't still on the loose. Furthermore, and perhaps more importantly, bad guys aren't the only ones who might be found inside a burgled home. There could be victims in there too, and in light of the violence that often accompanies home invasions, it's not unreasonable to think that those victims might be incapacitated, unconscious, or otherwise in need of assistance. Given the immediacy of a potential victim's needs—and equally importantly, the impossibility of determining the existence or

12

seriousness of those needs without briefly searching the home—we think it important to clarify that in circumstances like those here, the Fourth Amendment permits a limited warrantless sweep of the home to search for both perpetrators and potential victims.[4]

Nor, relatedly, would it make sense to draw a "bright line" between burglaries that (as it turns out) are actually "in progress" and those that (as it turns out) recently concluded. *Cf., e.g.*, *United States v. McCullough*, 457 F.3d 1150, 1164 (10th Cir. 2006) ("[A]n officer may lawfully enter a residence without a warrant under the exigent circumstances exception when the officer reasonably believes a burglary is in progress.") (internal quotation omitted). Again, a responding officer often won't immediately know whether it's the one or the other. Here, for instance, when Officers Raible and Carvajal apprehended Rivera and Copeland just outside Montanez's home's back door, they had no way of ascertaining whether they had just prevented a burglary that was about to happen, interrupted an ongoing burglary, or happened upon a burglary that had just concluded. The Fourth Amendment didn't require them to know the unknowable on pain of suppression—let alone personal liability. Rather, the Constitution gave them breathing space to do the best they could with the information they had. *Cf.,*

---

[4] The search, of course, must be "strictly circumscribed" by the nature of the exigency that authorized it—and thus, here, limited to the areas where a person reasonably could be found. *Mincey v. Arizona*, 437 U.S. 385, 393 (1978).

13

*e.g.*, *Graham v. Connor*, 490 U.S. 386, 396–97 (1989) ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.").  Moreover, and in any event, from a "reasonableness" perspective, it didn't much matter whether the suspected burglary was still ongoing or had recently concluded, because in the same way that burglary-related exigencies don't necessarily evanesce after a perpetrator has been apprehended, *see supra* at 12–13, they don't "instantaneously cease" when the crime is complete. *$291,828.00*, 536 F.3d at 1238.  Even if the burglars have moved on, they may well have left victims in their wake.  Accordingly, the exigencies justifying a warrantless entry exist in both the in-progress and recently-concluded scenarios: the police have a compelling need to search for additional suspects, potential victims, or both.

Our holding—that police investigating what they reasonably believe to be a residential burglary (whether ongoing or recently concluded) may conduct a limited warrantless search of the house to look for potential suspects and victims—comports with the Fourth Amendment's reasonableness requirement, as well as the common wisdom that the textual criterion embodies:  It would make no sense to compel an officer confronting a suspected burglary to quit the scene to procure a warrant, thereby jeopardizing the premises, the prospect of catching the culprits,

14

and the safety of potential victims inside the house.  What the Supreme Court said about the exigent-circumstances situation that it considered in *Michigan v. Fisher* applies equally in this case:  "It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here."  558 U.S. 45, 49 (2009) (*per curiam*).

The rule that we recognize today has the added benefit of clarity.  As the Supreme Court has emphasized, "a responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review."  *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001).  Rather, because "the Fourth Amendment has to be applied on the spur (and in the heat) of the moment," the "object in implementing its command of reasonableness is to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made."  *Id*.  Our holding—pursuant to which the burglary itself creates (or more accurately *is*) the exigency that justifies a limited warrantless entry to search for suspects and victims—provides police, citizens, and reviewing

15

courts the sort of "readily administrable" standard that the Supreme Court has deemed essential in the Fourth Amendment context. *Id.*[5]

## 2

Accordingly, whether the first two entries into Montanez's residence were constitutionally permissible turns on whether the officers had probable cause to suspect a burglary. If they did, then they could enter—and it seems clear to us that they did. Just before the incident, Officer Raible had been driving through an area that he knew was experiencing a spate of daytime burglaries. He observed Rivera walking around—seemingly nervously—while talking on a cell phone in front of a house whose driveway had no cars in it. He then watched Rivera take an unusual path around the house to the back door, where he also observed Copeland move

---

[5] Not surprisingly—to us, anyway—our decision reflects the consensus view among courts and commentators to have considered the burglary-as-exigent-circumstance issue. *See, e.g., United States v. Estese*, 479 F.2d 1273, 1274 (6th Cir. 1973) (exigent circumstances justified home search when officers had probable cause to believe a burglary had been or was being committed); *Carroll v. State*, 646 A.2d 376, 380 (Md. 1994) ("[T]he numerous state and federal courts which have considered this question have all held that warrantless entries are justified on the basis of exigent circumstances when the police reasonably believe that a burglary is in progress or has recently been committed."); *State v. Woods*, 524 S.E.2d 363, 366 (N.C. Ct. App. 2000) ("State and federal courts in other jurisdictions generally agree that where an officer reasonably believes that a burglary is in progress or has been recently committed, a warrantless entry of a private residence to ascertain whether the intruder is within or there are people in need of assistance does not offend the Fourth Amendment."); *Davis v. State*, 834 So. 2d 322, 327 (Fla. Dist. Ct. App. 2003) ("Police may enter a home to investigate a suspected burglary or to check on the safety of its residents, as those situations are generally considered exigent circumstances."); *see also* Wayne R. LaFave, Jerold H. Israel, *et al.*, *Criminal Procedure* § 3.6(f), at 259 (5th ed. 2009) ("Police may also enter private property for the purpose of protecting the property of the owner or occupant or some other person. The most common case is that in which the police have reason to believe the premises in question have been burglarized or vandalized. If the police are lawfully on the premises for this purpose, they may look to see if the burglar or vandal is still present, and may also take necessary steps to identify the occupant so that he may be notified.").

into what appeared to be a lookout position.  After detaining and searching the men, Raible found two kitchen knives in Rivera's pockets, and observed what seemed to be fresh—and matching—pry marks near the handle of the home's back door.  Finally, Rivera's and Copeland's IDs listed addresses different from the house's.  Under these circumstances, it was perfectly reasonable for the officers to conclude that they had interrupted a burglary.

Given the reasonableness of that conclusion, the officers' first two entries were lawful.  The first—Raible's 10-second entry into the home's vestibule to announce the police's presence—served to alert not only additional perpetrators but also potential victims that law enforcement was on the scene and in control.  Moreover, to meet the exigencies of the situation, a brief sweep of the home's main structure was warranted and appropriate.  Just as an additional perpetrator likely wouldn't have just surrendered in response to Raible's call, an incapacitated or unconscious victim likely couldn't have answered it.  Officers Carvajal, Bainbridge, Hart, and Rodriguez therefore sensibly searched the home—looking only in places where a person could be found—and while doing so happened to notice what appeared to be marijuana and drug paraphernalia sitting in plain view on a counter.  The officers acted no more broadly than was necessary to address and attend to the exigencies posed by the suspected burglary.  Their conduct, therefore, did not offend the Fourth Amendment.

17

**B**

Having approved the first and second entries, we can make quick work of Montanez's challenge to the subsequent entries, in which the officers re-entered several times to observe the marijuana and paraphernalia earlier discovered in plain view.  Our binding precedent makes clear that those entries were justified even though the exigency that underlay the first two searches had almost surely passed.  As the former Fifth Circuit noted, the Fourth Amendment exists to "protect[] the citizen against invasion of privacy."  *United States v. Brand*, 556 F.2d 1312, 1317 (5th Cir. 1977).[6]  "Once that interest is invaded legally by an official of the State, the citizen has lost his reasonable expectation of privacy to the extent of the invasion."  *Id*.  Accordingly, without offending the Fourth Amendment, "additional investigators or officials may … enter a citizen's property after one official has already intruded legally."  *Id*.

As already explained in detail, the officers' first two entries—during which they spotted the marijuana and paraphernalia—were justified under the exigent-circumstances doctrine.  Once those entries occurred, Montanez lost any reasonable expectation of privacy in the areas already searched.  The officers could thereafter enter and re-enter the residence to observe the contraband without

---

[6] Decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding on this Court.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

18

separately violating the Fourth Amendment. "Of course," absent a further justification, "the [officers had to] confine their intrusion to the scope of the original invasion," *id*. at 1317 n.9, but there is no contention here that any of the officers' additional entries exceeded the scope of the initial (and permissible) sweep.[7]

### III

Having determined that the officers didn't violate the Fourth Amendment, we **REVERSE** the decision of the district court and **REMAND** with instructions to grant the officers' motion for summary judgment.

---

[7] Because we conclude that the officers' entries didn't violate the Fourth Amendment, it goes without saying that no analogous precedent (or even obviously applicable general legal principle) "clearly established" that their entries were unlawful. And indeed, the district court's order denying the officers qualified immunity never suggests otherwise. The court went to great lengths to distinguish cases *authorizing* warrantless entries in circumstances like those here, but it never pointed to (nor have we found) any law or precedent that even remotely clearly established a contrary rule. Accordingly, even if a case could be made that the officers' entries here violated the Constitution—and for reasons explained, we're confident that they didn't—the officers would still be entitled to summary judgment under the second prong of the qualified-immunity standard.