[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-13883

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 26, 2004
THOMAS K. KAHN
CLERK

D.C. Docket No. 01-01318-CV-3-J-25TJC

DARLENE M. KESINGER, as Personal
Representative of the Estate of Charles
Scott Kesinger, and as Mother and Natural
Guardian of Charles Branden Kesinger and
Chad Scott Kesinger, Surviving Minor Children
of the Deceased, Charles Scott Kesinger,

Plaintiff,

ROBIN H. CONNER, as Personal Representative
of the Estate of Charles Scott Kesinger, and as
the Attorney Ad Litem of Charles Branden
Kesinger and Chad Scott Kesinger, Surviving
Minor Children of the Deceased, Charles Scott
Kesinger,

Plaintiff-Appellee,

versus

THOMAS HERRINGTON,

Defendant-Appellant,

NATHANIEL GLOVER, Sheriff of the
Consolidated City of Jacksonville,

Defendant.

————————————————

Appeals from the United States District Court
for the Middle District of Florida

————————————————

**(August 26, 2004)**

Before TJOFLAT and HILL, Circuit Judges, and MILLS*, District Judge.

HILL, Circuit Judge:

In this case the district court denied the individual defendant's motion for summary judgment on the basis that he was not entitled to qualified immunity. For the following reasons, we find that the defendant is entitled to qualified immunity. We reverse the judgment of the district court and remand with instructions that the district court grant the defendant's motion for summary judgment.

## I.  PROCEDURAL BACKGROUND

The Estate of Charles Scott Kesinger (Kesinger) filed a two-count civil action against the Jacksonville Sheriff's Office (JSO) and Deputy Officer Thomas Herrington resulting from the shooting death of Kesinger by Herrington. Count I is a claim under 42 U.S.C. § 1983 (Section 1983) that Herrington violated

—————————————

* Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

Kesinger's Fourth Amendment right to be free from unlawful seizure when Herrington allegedly engaged in "excessive, inappropriate, unnecessary and deadly force against [Kesinger] in the course of an investigatory encounter."[1]

Herrington, a police officer, claimed he was entitled to qualified immunity for the shooting. The district court disagreed and denied his motion for summary judgment. It found that due to conflicting testimony between Herrington's rendition of the facts, as the moving party, and one eyewitness' rendition of the facts, material issues of disputed facts existed. Therefore, in passing upon a summary judgment motion, the district court was required to accept the version most favorable to the non-movant, Kesinger.

## II. FACTUAL BACKGROUND

### A. *Herrington's Version of the Facts*

During busy early morning rush hour traffic on Interstate-95, Herrington was driving to work at the Police Memorial Building in downtown Jacksonville, Florida, in his unmarked patrol car. He observed Kesinger, whom he perceived to be a deranged, crazed man, standing in the middle of the interstate highway, facing heavy oncoming traffic, with his hands raised, palms out, over his head.

---

[1] Count II involved a claim against the JSO under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* It was dismissed by the district court and is not part of this appeal.

3

Herrington stopped and parked his car in the inside emergency lane. He radioed dispatch for assistance with an apparent suicide. Kesinger began walking from lane to lane, in an apparent attempt to harm himself and others by purposefully trying to stand in front of fast-moving cars and semi-trailer trucks.

Herrington was dressed in civilian clothes with a detective badge displayed on his belt. Leaving his gun in its holster on the front seat of the car, he got out of his car, yelled "HEY!" at the seemingly suicidal man, and motioned for him to get out of the oncoming traffic immediately. In reaction, Kesinger turned and started moving quickly toward Herrington, appearing angry and ready to fight, with his arms raised, palms out, screaming obscenely: "You see this, you see this . . . I am Jesus Christ, you motherfucker! I am going to die and so are you!"

Thus threatened, Herrington ran to his car for safety, rolled up the driver's side tinted window, locked the doors, and radioed for help a second time. By this time, Kesinger had moved to the rear of Herrington's car and started attacking the car. Herrington testified that he heard an explosion similar to a gunshot blast from the rear end of his car, and that the rear window broke inwardly. Herrington was hit by the flying glass. He lay down across the front seat and unholstered his gun.

Kesinger then moved to the driver's side window. Herrington heard another gunshot-like explosion. His tinted side window broke in a spider-webbed pattern.

4

Now believing that Kesinger had shot at him twice, Herrington, crouching on the front seat of his car, turned and fired in self defense through the spiderlike window.

Herrington then called dispatch a third time and told them that he had shot his assailant. He asked for an ambulance and a supervisor. Herrington opened the door, having to push hard against Kesinger's body as he did so. He trained his weapon on him until he determined that Kesinger was no longer a threat. Kesinger had collapsed down the driver's side door and lay on the ground, mortally wounded.

B. *Eyewitness William Michael Maley's Version of the Facts*

Although there were several eyewitnesses at the scene, the district court focused only on the testimony of one individual, William Michael Maley, who witnessed the shooting. Maley was in his car with his window down, moving slowly through the rubbernecked traffic, when his car pulled first behind, and then alongside, the passenger side of Herrington's vehicle, and rolled to a stop. He testified that he had a clear view of the altercation.

Maley disputes Herrington's statement that Kesinger struck the back of his car only one time. Instead Maley claims that Kesinger struck the trunk of the car multiple times with his fist, and then turned and struck the rear window five to

5

seven times, actually chipping away at it with his fist until it broke through entirely all the way up his arm. Maley also testified that Kesinger moved to the driver's side and banged on the roof.

Maley claims that Kesinger then appeared to be exhausted. Kesinger moved two steps back and to the right, took a few breaths, and appeared to cease his attack. It was then, Maley claims, that Maley saw a light, which he perceived to be the driver's side door opening, and saw two shots fired through an open door, not the spiderlike window, while Kesinger was in repose. Maley testified that Kesinger fell, not forward, against the driver's door, but backward, against the center median concrete divider, before falling to the ground.

Although not discussed by the district court, the affidavits and testimony of two other eyewitnesses, Carolyn Williams and James Ammons, corroborate the statements provided by officer Herrington and the physical evidence presented. They do not support the testimony provided by Maley.

C. *The Direct Physical Evidence Presented*

The forensic detective at the scene testified that photographic evidence indicated: (1) that Herrington's vehicle was not moved after the shooting; (2) that Kesinger was not moved after he was shot; (3) that Kesinger was standing immediately outside the car when he was shot, not five or six feet away against a

concrete divider; (4) that his body lay, not near the divider but so close to Herrington's vehicle that his feet were photographed  underneath the vehicle; (5) that there was a bullet hole in Herrington's driver's side window; (6) that the angle of the bullets indicated that a bullet went through the window from the inside out, not through an open door; (7) that there was glass found on top of Kesinger's body, indicating his close proximity to the car; and (8) that Kesinger's blood covered the driver's side window.

Dozens of photographs were taken at the scene, both from a ground level and an aerial view.  They clearly depict the location of Herrington's vehicle on the interstate, the position of Kesinger's body in relation to the car, and the broken windows of Herrington's car.  The photographs are consistent with Herrington's testimony and the testimony of the forensic detective.  They are inconsistent with Maley's perceptions.

### III.  STANDARD OF REVIEW

We review *de novo* the denial of a motion for summary judgment by a district court on the basis of qualified immunity, construing all facts and making all reasonable inferences in the light most favorable to the non-moving party. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).  However, a mere scintilla of evidence in support of the non-moving party's position is insufficient

to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505 (1986).

## IV.  DISCUSSION

### A.  *Excessive Force & Qualified Immunity*

The affirmative defense of qualified immunity protects public actors from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 102 S.Ct. 2727 (1982).  An officer will be entitled to qualified immunity if his actions were objectively reasonable, that is, if an objectively reasonable officer in the same situation could have believed that the force used was not excessive. *Anderson v. Creighton*, 107 S.Ct. 3034 (1987).

From a burden of proof standpoint, in order to receive qualified immunity, the public actor must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) *citing Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)(internal quotation marks omitted).  If he can do this, the burden then shifts to the plaintiff to establish that qualified immunity is not appropriate. *Id.*

Here it is clear that Herrington was acting within the scope of his discretionary authority when he intervened in Kesinger's apparent suicide attempt

8

and when the shooting occurred. *Vinyard*, 311 F.3d at 1346. Under Florida law, even a private actor is justified in the use of deadly force if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or to prevent the imminent commission of a forcible felony. *See* Fla. Stat. § 776.012.

The burden then shifts to Kesinger's estate to establish that Herrington violated Kesinger's constitutional rights. We  must determine whether appellant's allegations, if true, illustrate that a constitutional violation has occurred. *Vinyard*, 311 F.3d at 1346; *Saucier v. Katz*, 121 S.Ct. 2151 (2001). If indeed a constitutional right would have been violated under the appellant's version of the facts, we must next ask whether that right was clearly established. *Id.*

### B. *Excessive Force & Constitutional Violation*

The Fourth Amendment's freedom from unreasonable searches and seizures also encompasses the right to be free from the use of excessive force in the course of an investigatory stop, or other "seizure" of the person. *Graham v. Connor*, 109 S.Ct. 1865, 1867 (1989); *see Tennessee v. Garner*, 105 S.Ct. 1694, 1699-1707 (1985).[2] The "reasonableness" inquiry in an excessive force case is an objective

---

[2] The Supreme Court in *Graham* made explicit what was implicit in *Garner's* analysis, that is, "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed

one: the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. *Id.* at 1872. It must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id., citing Terry v. Ohio*, 88 S.Ct. 1868, 1879-1881 (1968).[3]

Appellant must establish that Herrington's fatal shooting was objectively unreasonable under the circumstances. *Graham*, 109 S.Ct. at 1872. We must consider Herrington's actions from the perspective of a reasonable officer on the scene, rather than through the lens of hindsight, *id.*, taking into account all of the attendant circumstances. *Id.* at 1865.

---

under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. *Graham*, 109 S.Ct. at 1871.

[3] Analyzing the objective reasonableness of the force used "requires a careful balancing of 'the nature and quality of the intrusion on an individual's Fourth Amendment interests' against the countervailing government interests at stake." *Graham*, 109 S.Ct. at 1871 *citing Terry*, 105 S.Ct. at 1699. To determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand. *See Cottrell*, 85 F.3d at 1492 (where the court considers the facts and circumstances confronting an officer, without regard to the officer's underlying intent or motivation, to determine whether their actions are objectively reasonable). The objectively reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 109 S.Ct. at 1875.

Here Herrington encountered a highly volatile situation fraught with danger.[4] Kesinger, an obviously deranged and crazed man, was seemingly trying to commit suicide by causing a motor vehicle to hit him on a busy interstate highway. It is obvious that Kesinger posed an immediate threat of harm, not only to himself and to Herrington, but to dozens of other motorists that morning.

Kesinger also behaved in an aggressive and belligerent manner. He turned and moved quickly toward Herrington, angry and ready to fight with his arms raised. He claimed to be Jesus Christ, and stated that he was going to die that day, and that Herrington was going to die also. When he fired at Kesinger, Herrington thought that Kesinger had shot at him first.[5]

Maley's version of the facts differed from Herrington's but not in any material way. Maley's version should not be misconstrued as disputed merely because they are taken out of context.

As he drove by, Maley was able to provide only a "snapshot" version of what happened on I-95 that day. He was neither privy to the series of events

---

[4] Herrington chose to stop and radio for help. In his unmarked patrol car, no one would have known had he chosen not to.

[5] Herrington only recalls single blows by Kesinger to the back and side of the patrol car. Maley testified that Kesinger inflicted multiple blows to the back of the car and also multiple blows to the roof and side of the car. In each instance it seems that the blow that broke the rear window and the blow on the driver's side window conveyed to Herrington that shots had been fired.

leading up to that snapshot, nor was he privy to the physical evidence at the scene after he drove away.

Due to the position of Maley's car, in order to see the events leading up to the shooting, Maley was forced to look through the tinted glass of the passenger side window, across the front seat of the car, and through the glass on the driver's side. Maley could only see Kesinger from the shoulders up.

Maley's testimony, if accepted, would be the version most favorable to the non-moving party. However, it is in direct conflict with the unanimous testimony of the other eyewitnesses, and is contradicted by the undisputed, clearly demonstrated, photographed physical evidence.

In addition, Maley's testimony is inconsistent with the initial written statements that he made to the police, and which he readily admits that he intentionally signed. Maley explains these inconsistences merely by saying that he signed the statements, knowing them to be false at the time, because he wanted the officers to leave and get out of his house.

In his testimony, Maley states that he cannot explain why his perception of the scene is inconsistent with the photographic evidence that he reviewed. Maley's version of the facts is not substantial evidence and must be disregarded.

12

We conclude that there was no substantial evidence contrary to that of the testimony of Herrington, Williams, Ammons, and the forensic detective on the scene, and the photographic evidence admitted. A mere scintilla of evidence in support of the non-movant is insufficient to defeat a motion for summary judgment. *Anderson*, 106 S.Ct. at 2512. Herrington's estate has not established that the shooting was objectively unreasonable, given the circumstances. No constitutional violation is present.

### C. *Excessive Force & Clearly Established Law*

Even if we were to assume hypothetically that Herrington actually did violate Kesinger's Fourth Amendment rights, it could not be said however that Herrington violated any clearly established law. Before qualified immunity is surrendered by an officer, he or she is entitled to fair and clear warning that the challenged conduct violates federally protected rights. *See Vinyard*, 311 F.3d at 1350.[6]

---

[6] The court in *Vinyard* identified three categories of fair and clear warning for us to examine. *Id.* (1) First, we look to see whether the federal statute or constitutional provision is so clear, and the conduct is so bad, that it precludes qualified immunity even in the total absence of case law. *Id.* Second, if the conduct is not bad enough that it violates a constitutional provision on its face, we look to case law that can be applied broadly to a number of factual situations. *Id.* at 1351. Third, and finally, if no broad case law is applicable, we turn to case law precedent that is tied to the facts. *Id.*

We have found no preexisting case law involving materially similar facts that would give a reasonable police officer fair and clear warning that shooting a crazed man, intent upon causing harm to himself and others, including the officer who had retreated as far as possible, and has acted in self defense, violated the Constitution.[7]  *See Garrett v. Athens-Clarke County, Ga.*, ___ F.3d ___, 2004 WL 1700118 (11th Cir., July 30, 2004)(where defendants did not use excessive force when they fettered the plaintiff *after* he was made compliant through the use of pepper spray).  Here Herrington acted in self defense.  He did not violate the Constitution or any clearly established law.  He is entitled to qualified immunity.

## V.  CONCLUSION

Based upon the foregoing, the judgment of the district court is reversed and this case is remanded with instructions to grant his motion for summary judgment.

REVERSED and REMANDED with INSTRUCTIONS.

---

[7] The closest case we have found is *Mercado v. City of Orlando*, ___ F.Supp.2d ___, 2004 WL 1443939 (M.D.Fla., 2004), where two police officers, faced with a man who was threatening to commit suicide, who was holding a knife with two hands, pointing it at his heart and refusing to drop it after being ordered at least twice to do so, shot the plaintiff in the head with a Sage launcher, fracturing his skull and causing lasting brain damage.

The district court found that because the officers were trying to resolve an attempted suicide, rather than to halt the progression of a crime, the case did not fit neatly into the *Graham* analysis (discussed above at our Part IV.B).  Unlike the suicidal appellant in our case, the plaintiff in *Mercado* did not pose an immediate threat to anyone, other than himself.  *Id.* at * 4. He was neither aggressive nor belligerent.  He did not threaten the officers verbally or physically. *Id.*  Even then the *Mercado* district court found that clearly established law had not been violated and that the officers were entitled to qualified immunity.  *Id.* at * 7.  The same is especially true in our case.