Deborah Carol SCHULTZ, Plaintiff,

v.

Wendell HALL, in his official capacity as Sheriff of Santa Rosa County, Florida; Douglas M. Bringmans, in his individual capacity; and Adam John Teichner, in his individual capacity, Defendants.

No. 3:04CV242MCR.

United States District Court,
N.D. Florida,
Pensacola Division.

April 15, 2005.

Robert T. Bleach, Pensacola, FL, for Plaintiff.

John W. Jolly, Jr., Tallahassee, FL, for Defendants.

## ORDER GRANTING SUMMARY JUDGMENT

RODGERS, District Judge.

Plaintiff Deborah Carol Schultz ("Plaintiff") sues Santa Rosa County Sheriff's Department Sheriff Wendell Hall ("Sheriff Hall") and Deputies Douglas M. Bringmans ("Deputy Bringmans") and Adam John Teichner ("Deputy Teichner") (together, "Defendants"), claiming excessive use of force and battery during an arrest. Presently before the Court are Defendants' motion for summary judgment, with memorandum and evidentiary materials in support (doc. 18), to which Plaintiff has filed a response and evidentiary materials in opposition (docs. 21, 22 23, 25). For the reasons that follow, the Court grants Defendants' pending motion.

### BACKGROUND

*Facts and Procedural History*

Except as noted, the following facts are undisputed.[1] In the late afternoon hours

---

1. Defendants state that they assume for purposes of their motion that Plaintiff's version of

of of December 25, 2002, sometime before 5:30 p.m.,[2] Plaintiff was driving west on Highway 98 towards her home in Navarre, Florida. Approximately ninety minutes earlier Plaintiff had consumed one and one-half glasses of wine at a Sandestin hotel. (Doc. 23, Plaintiff's Deposition at 71, 105) (Doc. 18, Exh. A, Plaintiff's Answers to Defendants' Interrogatories, Nos. 8, 23). Plaintiff was speeding in order to get home quickly as she urgently needed to urinate and, due to the Christmas Day holiday, no public rest room facilities were readily available along her route. (Plaintiff's Dep. at 72, 74, 78).

At the time Plaintiff was approaching Navarre, Deputy Bringmans and Deputy Teichner were on patrol in the area in their police cruisers. The deputies heard their dispatcher transmit a BOLO, which Deputy Bringmans recalled was for "a reckless or possible intoxicated driver." (Doc. 23, Bringmans' Dep. at 6, 7; doc. 23, Teichner's Dep. at 6). Deputy Bringmans was the first to spot the suspect automobile, later determined to be driven by Plaintiff. He immediately commenced pursuit and, after catching up with Plaintiff, clocked their speed at approximately seventy-five miles per hour in a forty-five miles per hour zone. (*Id.* at 9). After

continuing to follow Plaintiff for about four hundred yards Deputy Bringmans activated his emergency lights and siren. (*Id.* at 10). At this time Plaintiff reduced her speed to approximately thirty-five miles per hour but continued driving. (*Id.* at 10). According to Plaintiff, she slowed her vehicle in order to determine whether a grocery store and its bathroom facilities might be open and did not notice the police cruiser behind her. (Plaintiff's Dep. at 78). Also at about this time Deputy Teichner saw Deputy Bringmans following Plaintiff and joined the pursuit, activating the emergency lights on his patrol car and falling in behind the two vehicles in the outside lane. (Bringmans' Dep. at 11; Teichner's Dep. at 6–7).

After driving a short distance Plaintiff pulled onto the shoulder of the highway and came to a complete stop. (Bringmans' Dep. at 11–12; Teichner's Dep. at 8). The deputies also pulled over but before they could exit their cruisers and approach Plaintiff's vehicle, Plaintiff resumed driving west on the main roadway at approximately thirty-five miles per hour. (Bringmans' Dep. at 11–13; Teichner's Dep. at 8–9). The deputies commenced following Plaintiff again, with Deputy Teichner moving into the left lane at Deputy Bringmans'

---

the facts is true. (Doc. 18 at 1). In her response to Defendants' motion, however, Plaintiff disputes certain of the facts as referenced by Defendants, describing them as "inaccurately represented" or in fact as presenting genuine issues for the jury. (Doc. 22 at 1).

At summary judgment this Court must view the facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The Court therefore does so here, drawing those facts from the pleadings, depositions, and other evidentiary materials on file. Nevertheless, the Court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts. *See Montoute v. Carr,* 114 F.3d 181, 182 (11th Cir.1997).

**2.** Plaintiff testified in her deposition that the time of her arrest was approximately 5:30 p.m., when dusk was falling but it was not entirely dark. (Plaintiff's Dep. at 104). Apparently relying on their contemporaneously prepared reports, however, the deputies testified in their depositions that they received the BOLO ["be on the look out"] for the vehicle which turned out to be driven by Plaintiff at approximately 6:30 p.m. (Bringmans' Dep. at 7; Teichner's Dep. at 6). No other evidence has been submitted on this issue. Accordingly, for the purpose of the Court's summary judgment review it is assumed that the time of Plaintiff's arrest was approximately 5:30 p.m., and that it was dusk.

radioed instruction. (Bringmans' Dep. at 12). After having traveled approximately 300 yards Plaintiff's vehicle entered the right turn lane, near the entrance to a pharmacy. (*Id.*; Teichner's Dep. at 9). According to Plaintiff, she had again reduced her speed to see whether the business might be open so that she could use the rest room, as by that time she was "about to wet [her] pants." (Plaintiff's Dep. at 79). Seeing that the pharmacy was closed, without stopping her vehicle completely Plaintiff again resumed driving on Highway 98, with Deputies Bringmans and Teichner maintaining their pursuit. (Bringmans' Dep. at 13; Teichner's Dep. at 9). Proceeding about three hundred to four hundred yards, Plaintiff turned right on Blue Tip Drive, towards her home. (*See* Bringmans' Dep. at 13; Plaintiff's Dep. at 79). Prior to turning Plaintiff had suddenly seen "a police officer next to [her] with the lights on and then [she] saw one behind [her]" but thought the officers must be pursuing someone else. (Plaintiff's Dep. at 79). When Plaintiff realized that she was the intended target of the law enforcement vehicles, she pulled off to the side of the road and stopped her car, which was now just a few doors away from her home. (*Id.*).

Deputy Bringmans and Deputy Teichner halted and exited their vehicles, preparing to conduct a felony stop. With Deputy Bringmans in the lead and their weapons drawn, the two officers approached Plaintiff's vehicle; Deputy Bringmans moved towards the driver's side of the car and Deputy Teichner moved towards the passengers' side. (Bringmans' Dep. at 14; Teichner's Dep. at 10). At Deputy Bring-

mans' order, Plaintiff turned off her car's engine and showed him her hands by opening the vehicle door. (Bringmans' Dep. at 14). Once Deputy Bringmans saw that Plaintiff did not possess a weapon and determined that she posed no threat to him or Deputy Teichner, he secured his gun and escorted Plaintiff from the vehicle by taking her wrist. (*Id.* at 14–15). Deputy Teichner then joined Deputy Bringmans and Plaintiff on the driver's side of the car. (Teichner's Dep. at 12).

According to Deputy Teichner, Plaintiff had an obvious odor of alcohol about her, her speech was slurred, and her clothes were in disarray, with her shirt partially untucked and her pants unbuttoned. (*Id.*). Deputy Bringmans also observed that Plaintiff's pants were undone and that she smelled of alcohol. (Bringmans' Dep. at 15–16). When asked about the state of her clothes, Plaintiff explained that she was "in a hurry to go to the rest room." (*Id.* at 16). Deputy Bringmans also noted that Plaintiff was "leaning up against her car and she was ... kind of incoherent to what I was telling her" as he was asking for her driver's license and registration; Plaintiff also "kept jumping back and forth in her story" about where she had been and how she needed to get to a bathroom. (*Id.* at 15–16).

Deputy Teichner asked Plaintiff if she would submit to field sobriety tests, specifically the test which assesses the ability to walk in a straight line. (Teichner's Dep. at 14; Plaintiff's Dep. at 90). Plaintiff refused, stating that she could not walk a straight line due to the reverse prosthesis in her left shoulder.[3] As described by Plaintiff,

---

**3.** Plaintiff's orthopedic surgeon, Mark Frankel, M.D., testified that in November 2001 he implanted a reverse shoulder prosthesis in Plaintiff's left shoulder. (Doc. 23, Frankel's Deposition, at 7). Dr. Frankel described a reverse prosthesis as a "custom" device he had designed for patients who have a "defi-

cient rotator cuff and instability and/or arthritis" of the shoulder. (*Id.* at 6, 12). He noted that at the time of his deposition, November 2003, the device was undergoing FDA and clinical trials and that much still remained to be learned about the procedure. (*Id.* at 6,

In 2001, I had a reverse prosthesis total shoulder replacement. My physician noted that the prosthesis resulted in a functional deficit of gait disturbance with a number of falls and frequent loss of balance. I informed Deputy TEICHNER that I had difficulties with my balance due to the prosthesis in my left shoulder and that this would affect my ability to walk in a straight line. Deputy TEICHNER then informed me that I was under arrest. Deputies BRINGMANS and TEICHNER reached for my hands, attempting to handcuff my arms behind my back. I told the deputies that I could not have my arms behind my back due to the prosthesis in my left shoulder, and I requested that if they must handcuff me, to do so with my arms in front of my body. Deputies BRINGMANS and TEICHNER ignored this request and proceeded to pull my arms behind me. Fearing that my prosthesis would be damaged, I tried to prevent damage to my prosthesis by twisting my body to keep from having my hands cuffed behind me. I am extremely small framed and not a physically intimidating or threatening individual. I was not violent and never posed a threat to the two large officers. I continued to inform the deputies of my fragile shoulder and requested for the second time that they handcuff my arms in front. Despite their knowledge of my prosthesis BRINGMANS and TEICHNER violently wrenched my arms behind my back, handcuffed me, and arrested me for DUI [driving under the influence], evading police, and resisting arrest.[4] Deputies BRINGMANS and TEICHNER yanked my arms behind me with such force that it resulted in a non-displaced fracture of my [left] humerus.[5] After I was placed in the Sher-

11). The device, which Dr. Frankel described as a "revolutionary treatment," provides stability "by attaching [a] ball onto the socket side of the shoulder blade and the socket onto the arm, so it's [the] reverse from normal shoulder anatomy . . . ." (*Id.* at 6, 13).

Dr. Frankel stated that Plaintiff's surgery had been an attempt to "salvage" her left arm and that, if the device failed or was damaged, it could be "relatively catastrophic," possibly resulting in the need to amputate the limb. (*Id.* at 11, 14). Dr. Frankel stated that he had repeatedly cautioned Plaintiff about the need to protect the device and the possible consequences if the device failed. (*Id.*). According to Dr. Frankel, "in all medical probability, on the day in question [December 25, 2002] if Ms. Schultz' shoulder on her left side was pulled, jerked, or twisted, it would adversely affect her shoulder function and cause shoulder pain"; likewise, handcuffing Plaintiff behind her back would cause pain and possible severe injury to the left shoulder. (*Id.* at 10–11). Dr. Frankel examined Plaintiff on November 8, 2002, when her shoulder function was from one-third to one-half of normal, which was satisfactory to Plaintiff (*id.* at 8); when he examined her on January 7, 2003, the shoulder was not dislocated but function had been reduced to "minimal." (*Id.* at 17).

4. Defendants submitted a document entitled "Judgment and Sentence" from the Circuit Court for Santa Rosa County, Florida, dated January 2, 2004. (Doc. 18, Exh. 2). It reflects that Plaintiff pleaded *nolo contendere* to Count I, identified as a lesser included offense of reckless driving (a second degree misdemeanor). Plaintiff also notes in her response to Defendants' motion that the DUI charge was reduced to the lesser included offense of reckless driving. (Doc. 21 at 8, n. 5). The Judgment and Sentence also indicates that Plaintiff pleaded *nolo contendere* to Count 3, identified as the offense of resisting an officer without violence (a first degree misdemeanor), and that adjudication was withheld as to this Count. The document does not give any particulars as to Count 2 but notes that it was *nol prossed.* Plaintiff states in her response that the only felony count against her was the *nol prossed* fleeing and eluding a law enforcement officer charge. (Doc. 21 at 6).

5. Plaintiff's answer to Interrogatory # 23 refers to her right humerus having been fractured. In her response to Defendants' motion Plaintiff corrects this erroneous reference, clarifying that it was her left humerus which was broken. (Doc. 21 at 2). The humerus is "[t]he bone of the arm, articulating with the

iff's car, I pleaded with Deputy BRING-MANS and TEICHNER to let me use the bathroom in my home. Although the bathroom was less than one half of a block away from where I was stopped, my repeated and desperate pleas to use the rest room were ignored, resulting in my wetting myself in the Sheriff's car on the way to the substation.

Doc. 18, Exh. A, Plaintiff's Answers to Defendants' Interr. No. 23.

On July 8, 2004, Plaintiff filed the instant suit. Invoking federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, *et seq.*, and supplemental jurisdiction pursuant to 29 U.S.C. § 1367, Plaintiff asserts two claims. In Count I, brought under 42 U.S.C. § 1983, Plaintiff alleges that Deputies Bringmans and Teichner used excessive force when arresting her on December 25, 2002, in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution. In Count II, brought under the common law of the State of Florida, Plaintiff alleges that the conduct of Deputies Bringmans and Teichner constitutes a battery committed without malice for which, under the doctrine of *respondeat superior*, Sheriff Hall may be held liable. In the alternative, Plaintiff alleges that the deputies' conduct was malicious and thus that they, rather than Sheriff Hall, are liable for the alleged battery. As relief Plaintiff seeks, *inter alia*, compensatory and punitive damages against Deputy Bringmans and Deputy Teichner, and compensatory damages against Sheriff Hall.

In their motion for summary judgment, Defendants contend that on the undisputed material facts they are entitled to judgment as a matter of law. Deputies Bringmans and Teichner assert as an affirmative defense their entitlement to qualified immunity, apparently on the reasoning that they committed no constitutional violation and that, even if they did, the unlawfulness of their conduct was not clearly established at the time. The deputies also assert as affirmative defenses that the force used to handcuff Plaintiff was constitutionally *de minimis* and that the handcuffing was ancillary to accomplishing lawful objectives and thus privileged. Sheriff Hall likewise raises privilege as a defense. He also contends that the Court would lack subject matter jurisdiction over the state law claim against him if summary judgment is granted to Deputies Bringmans and Teichner on the federal cause of action, although the Court could also decide this issue in his favor on the merits.

In reply to Defendants' motion Plaintiff argues that there simply was no cause for Deputies Bringmans and Teichner to use such force during the arrest that her previously uninjured left humerus was fractured. (Doc. 21 at 4). Plaintiff, "an unarmed, non-violent, 110–pound, 5′ 2″ tall woman, was being detained for minor offenses, posed no threat, and was not fleeing or offering any significant resistance at the time the force was applied." (*Id.* at 4, 11). Responding to Defendants' reliance on *Rodriguez v. Farrell*, 294 F.3d 1276 (11th Cir.2002) ("*Rodriguez II*"), *cert. denied*, 538 U.S. 906, 123 S.Ct. 1482, 155 L.Ed.2d 225 (2003), Plaintiff argues that factual distinctions between that case and the instant one demonstrate that *Rodriguez II* actually supports her claim. Plaintiff also contends that the force employed against her cannot be described as *de minimis* and that the deputies conduct violated clearly established law, which precludes granting them qualified immunity. Plaintiff also asserts that none of the Defen-

---

scapula [shoulder blade] above and the radius and ulna below." *Seedman's Medical Dictio-* *nary,* 25th Ed. (1990), p. 727.

dants is entitled to summary judgment on her battery claim, as the issues of whether the deputies acted with malice or excessive force are for the jury to decide. Moreover, Plaintiff points out, the deputies failed to seek summary judgment on this claim and thus are not entitled to judgment in their favor on it. Finally, for reasons of efficiency and economy, in the event that summary judgment is granted on her constitutional claim Plaintiff asks that the Court retain jurisdiction over her state law battery claim.

## LEGAL STANDARDS

### Summary Judgment

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A factual dispute is " 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Tipton v. Bergrohr GMBH–Siegen*, 965 F.2d 994, 998 (11th Cir.1992). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Nevertheless, a general denial unaccompanied by any evidentiary support will not suffice. *See, e.g., Courson v. McMillian*, 939 F.2d 1479 (11th Cir.1991);

*Hutton v. Strickland*, 919 F.2d 1531 (11th Cir.1990). Moreover, the existence of a scintilla of evidence in support of the nonmovant's position is insufficient; the test is "whether there is [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. 2505.

### Use of Excessive Force

 The Supreme Court has instructed that all claims of the use of excessive force by law enforcement officers in the course of an arrest are properly analyzed under the Fourth Amendment and its reasonableness standard. *See Jackson v. Sauls*, 206 F.3d 1156, 1167 (11th Cir.2000) (*quoting Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The court's inquiry in an excessive force case must focus on whether the officer's actions were "objectively reasonable" in light of the facts and circumstances confronting him; thus his conduct must be judged from "the perspective of a reasonable officer on the scene, rather than through the lens of hindsight [ ], taking into account all of the attendant circumstances." *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir.2004) (*citing Graham* );*Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir.2002). In examining the officer's conduct, the court should look to the "totality of circumstances" to determine if the manner of arrest was reasonable. *See Draper v. Reynolds*, 369 F.3d 1270, 1277 (11th Cir.2004) (*citing Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985)). To assess whether the force used was reasonable, "courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Id.* at 1277–78 (citations and footnote modified); *see also Vinyard*, 311 F.3d at 1347. The need for the application of

force is assessed by whether the force used was reasonably proportionate to the need for that force, which is measured by considering the severity of the crime, whether the suspect posed an immediate danger to the officer or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *See Durruthy v. Pastor,* 351 F.3d 1080, 1094 (11th Cir.2003) *(quoting Graham),* as cited in *Lee v. Ferraro,* 284 F.3d 1188, 1197–98 (11th Cir.2002)); *see also Draper,* 369 F.3d at 1277, n. 13 *(citing Lee ).* It is also well-settled that the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865; *Durruthy,* 351 F.3d at 1094; *Vinyard,* 311 F.3d at 1347; *Lee,* 284 F.3d at 1197. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865; *see also Crosby v. Monroe County,* 394 F.3d 1328, 1333 (11th Cir.2004) (noting that courts must not "view the matter as judges from the comfort and safety of our chambers ... [but rather] must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction .... ").

*Qualified Immunity*

■ A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity. *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1263 (11th Cir.2004). It is well settled that "[q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct

'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard,* 311 F.3d at 1346 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). As a general proposition, "[i]t is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." *Thornton v. City of Macon,* 132 F.3d 1395, 1400 (11th Cir.1998). Thus, with regard to a claim of the use of excessive force, if an objectively reasonable officer in the same situation could have believed that the force used was not excessive, the defendant is entitled to qualified immunity. *Anderson v. Creighton,* 483 U.S. 635, 638–41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Kesinger,* 381 F.3d at 1247.

■ To be eligible for qualified immunity, the official must first establish that he was performing a "discretionary function" at the time the alleged violation of federal law occurred. *See Crosby,* 394 F.3d at 1331 *(citing Holloman,* 370 F.3d at 1263–64). Once the official has established that he was engaged in a discretionary function, the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity. *Holloman,* 370 F.3d at 1264. The Supreme Court has set forth a two-part test for the qualified immunity analysis. "The threshold inquiry a court must undertake ... is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002) *(citing Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. "If a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to

ask whether the right was clearly established.'" *Vinyard,* 311 F.3d at 1346 (quoting *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151). Before qualified immunity is surrendered by an officer, he is entitled to fair and clear warning that the challenged conduct violates federally protected rights. *See Vinyard,* 311 F.3d at 1350–51 (identifying three categories of fair and clear warning: where the conduct is so egregious that it violates the constitution on its face, regardless of the absence of authoritative case law; where the conduct does not violate the constitution on its face but case law exists which can be applied broadly to various factual situations; and where no broad case law applies but there exists precedent which is tied to the facts). Nevertheless, there need not be a case "on all fours," with materially identical facts, before qualified immunity will be denied. "A principle of constitutional law can be 'clearly established' even if there are 'notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights.'" *Holloman,* 370 F.3d at 1277 (*quoting United States v. Lanier,* 520 U.S. 259, 269, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997)).

### DISCUSSION

*Count I: Section 1983 Claim Against Deputy Bringmans and Deputy Teichner*

▉ As an initial matter, the Court finds that Deputies Bringmans and Teich-

ner were engaged in a discretionary function during the events at issue in this case, since making an arrest is within the official duties of a sheriff's deputy. *Crosby,* 394 F.3d at 1332. The Court therefore next considers the question of whether the deputies are entitled to summary judgment under the doctrine of qualified immunity. Viewing the evidence in the light most favorable to Plaintiff and taking into consideration the "totality of the circumstances", *see Draper,* 369 F.3d at 1270, the Court is persuaded that Plaintiff has failed to demonstrate that the manner of her arrest was unconstitutional. Rather, the Court concludes that, on balance, the evidence shows that the manner of arrest was reasonable and thus that no constitutional violation occurred.

▉ Painful handcuffing in the course of an arrest, without more, does not amount to excessive force if the resulting injuries are minimal. *Nolin v. Isbell,* 207 F.3d 1253, 1257–58 (11th Cir.2000). In the instant case, however, the hairline fracture of Plaintiff's left arm may be said to constitute a more than *de minimis* injury. Thus the "extent of injury" consideration should be weighed in Plaintiff's favor.[6]

Turning to consideration of the need for the application of force, the Court—with some reluctance—accepts that *Graham*'s severity-of-the-crime factor weighs in

---

**6.** Plaintiff submitted a copy of an unsigned note on a prescription pad dated December 30, 2002, on which is written "nondisplaced fracture humerus—diaphysis. No evidence of loosening of prosthesis. Pull of arm caused injury." (Doc. 21, Exh. 2). Other than that note, the record contains no primary medical records. Thus there is no medical evidence regarding whether the fracture necessitated significant medical care, although Plaintiff testified that x-rays were taken for diagnostic purposes and that she temporarily used a sling. (Plaintiff's Dep. at 92, 111, 113). Nor is the record clear on the degree of persistent residual damage which may have resulted from the fracture, if any. Plaintiff did complain of soreness of her left arm near the site of the fracture at time of her January 2005 deposition, (Plaintiff's Dep. at 111), although her prosthesis evidently continued to be functional.

Plaintiff's favor.[7] Two of the three charges for which Plaintiff was arrested, and with which she was charged (first offense DUI and resisting a law enforcement officer) were misdemeanors, and neither offense involved violence. The *nol prossed* charge, fleeing and eluding a law enforcement officer, was a felony but it too did not involve violence. Furthermore, the severity of this offense may be mitigated somewhat by the deputies' testimony that suggests they may have believed Plaintiff's statements at the scene that she was speeding due to her urgent need to get to a rest room, (Bringmans' Dep. at 22), and that she did not stop because she thought they were trying to go around her in pursuit of another vehicle. (Teichner Dep. at 13).

Similarly, as to the second *Graham* factor, it appears to be undisputed that Plaintiff did not pose an immediate danger to the officers or other persons as she stood by her vehicle after finally stopping in response to the deputies' flashing emergency lights and sirens. Deputy Bringmans acknowledged as much when he testified that he holstered his firearm after approaching Plaintiff and ascertaining that she had no weapons and was "no threat to me or the other officer[ ]." (Bringmans' Dep. at 14). Moreover, the record reflects nothing to suggest that Plaintiff, a woman of slight build and stature, posed any serious physical threat—either real or perceived—to the two larger male officers. Thus this factor regarding the need for the application of force may also be deemed to be in Plaintiff's "column."

The Court finds otherwise with respect to the third *Graham* factor, which requires consideration of whether the suspect was actively resisting arrest or attempting to evade arrest by flight. It is true that the evidence does not reflect that at the time the officers attempted to place handcuffs on Plaintiff she was actively attempting to evade arrest by flight. Nevertheless, Plaintiff acknowledges, and does not dispute, the officers' deposition testimony that she was "combative" during the during the detention and handcuffing. (Doc. 21 at 8). She attempts to downplay her resistance to being handcuffed, however, by characterizing it as "passive" or "insignificant" in that she was "merely tr[ying] to protect her fragile left shoulder" by "tens[ing]" her body, as described by Deputy Bringmans.[8] (*Id.* at 9, 10; Bringmans Dep. at 17). Contrary to Plaintiff's assertion, however, her own testimony—which is consistent with that of the deputies— reflects that she was not simply passively resisting the attempt to handcuff her; rather her resistance was active, albeit mild. Plaintiff admits she physically "twisted" away from the deputies. (Doc. 18, Exh. A, Plaintiff's Answers to Defendants' Interr. No. 23). Moreover, this admission seems consistent with Deputy Teichner's undisputed testimony that as he told Plaintiff to put her hands behind her back for cuffing she "started to resist and pull away," that she "kept trying to pull away and not to be handcuffed," and that she "[pulled] her hands away" from efforts to cuff her. (Teichner Dep. at 15). In addition, Plaintiff acknowledges yelling

7. The Court feels somewhat troubled in concluding that an offense involving driving an automobile under the influence of alcohol is anything less than a severe crime. Although the DUI offense ultimately was reduced to reckless driving, the crime of which the deputies suspected Plaintiff of having committed and for which they arrested her on December 25, 2002, was DUI. And while DUI may not be a violent crime, it clearly can be a dangerous one and thus arguably is "severe."

8. According to Deputy Bringmans, during the handcuffing he was stationed at Plaintiff's right side attempting to grasp her right hand, and Deputy Teacher was on her left side attempting to restrain her left hand. (Bringmans' Dep. at 18).

and "screaming at the top of [her] lungs" about her shoulder as the handcuffing proceeded. (Plaintiff Dep. at 91, 103). Accordingly, as to the need for the use of force, the Court concludes that the third *Graham* factor, which in part addresses whether Plaintiff was actively resisting arrest, weighs in the deputies' favor.

In this case, the Court finds the third *Graham* factor to be the most significant in analyzing whether there was a need for the deputies to employ force against Plaintiff. Under the circumstances with which the deputies were presented, the Court concludes that the deputies reasonably determined that it was necessary to use a limited amount of force in handcuffing Plaintiff in order to immediately restrain and secure her. The undisputed evidence shows that the deputies were confronted with a suspect who—notwithstanding an asserted urgent need to urinate—had failed to stop immediately when followed by two police cruisers with their emergency lights and sirens activated for some distance, who smelled of alcohol and whose speech was slurred, who was agitated and uncooperative, and who—notwithstanding an asserted inability to walk a straight line due to a reverse shoulder prosthesis—refused to take a field sobriety test. Most importantly, when the deputies attempted to commence handcuffing the suspect, she actively refused by moving her arms and twisting away. Further adding to the confusion and potentially escalating the situation, the suspect was yelling and screaming. In short, for these reasons the Court concludes that Plaintiff has not met her qualified immunity burden on the issue of the need to apply force. Rather, especially given the "tense, uncertain, and rapidly evolving" circumstances surrounding Plaintiff's detention and arrest, the Court finds that the question of whether the deputies reasonably needed to employ to force to restrain Plaintiff and take her into custody is properly decided in the deputies' favor. *See Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865.

Likewise, the Court concludes that Plaintiff has not shown that the relationship between the need for force and the actual amount of force used was inappropriate. Taking the evidence in the light most favorable to Plaintiff, the Court concludes that a mild amount of resistance to handcuffing was met with a reasonably commensurate amount of force. Even assuming the officers "pulled," "violently wrenched," or "yanked" Plaintiff's arms behind her back in order to place the cuffs on her hands, as she contends, such actions were not excessive or disproportionate under circumstances described above. The unfortunate fact that the deputies' actions evidently resulted in causing a hairline fracture of Plaintiff's left humerus does not, as Plaintiff apparently would have it, mean *ipso facto* that the force used was excessive. Indeed, the Eleventh Circuit recognizes that typically arrests involve some force and some injury. *Nolin,* 207 F.3d at 1257–58.

As noted previously, both parties point to *Rodriguez v. Farrell,* 294 F.3d 1276 (11th Cir.2002) (*"Rodriguez II"*), *cert. denied,* 538 U.S. 906, 123 S.Ct. 1482, 155 L.Ed.2d 225 (2003), in support of their respective positions regarding whether the amount of force applied was excessive. In *Rodriguez v. Farrell,* 280 F.3d 1341 (11th Cir.2002) (*Rodriguez I* ), *rehearing denied,* 294 F.3d 1276 (11th Cir.2002) (*"Rodriguez II"*), the Eleventh Circuit reversed and remanded the trial court's denial of qualified immunity on the plaintiff's claims that police officers violated his Fourth Amendment rights in the course of his arrest. The handcuffing to which the plaintiff was subjected caused recently implanted internal surgical hardware in his elbow to loosen, resulting in more than twenty-five subsequent surgeries and ultimately the

amputation of the plaintiff's arm below the elbow. *Rodriguez I*, 280 F.3d at 1351. In a detailed analysis, the Eleventh Circuit found no constitutional violation in the manner of the arrest; the Court also made the alternative finding, without discussion, that the police officer was entitled to qualified immunity. *Rodriguez I*, 280 F.3d at 1353, n. 21. In *Rodriguez II*, the court denied the plaintiff's petition for rehearing and suggestion for rehearing *en banc*. It held, *inter alia*, that a police officer was not required to credit everything a suspect tells him, particularly when the officer is in the process of handcuffing the suspect, and that the officer in the case at bar was not liable on an excessive force claim simply because he continued the handcuffing process after the plaintiff informed him that he had an injured arm. *Rodriguez II*, 294 F.3d at 1278.

Plaintiff contends that the facts of the *Rodriguez* cases are distinguishable from those in her case and thus that a different result should ensue. According to Plaintiff, unlike Rodriguez, she "informed the Defendants of her fragile shoulder *well before the handcuffing commenced, and made it clear that it was a pre-existing condition that would be put at great risk by a behind-the-back handcuffing.*" (Doc. 21 at 11, citing Plaintiff's Answer to Defendants' Inter. No. 23; Plaintiff's Dep. at 91; Teichner's Dep. at 14) (emphasis added by Court). Therefore, she contends, the officers were not entitled to discount her claim of a shoulder injury which precluded handcuffing her behind her back.

With the reverse prosthesis in her left shoulder, Plaintiff appears to have had a pre-existing condition which "made what otherwise would be a common non-excessive handcuffing technique (that ordinarily would be painful but cause minimal injury) a maneuver that caused severe injury ..." *Rodriguez I*, 280 F.3d at 1351. Nevertheless, "[w]hat would ordinarily be consid-

ered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition *the extent of which was unknown at the time.*" *Id.* at 1353 (emphasis added). Here, as Plaintiff submits, the testimony reflects that prior to the deputies' commencing the handcuffing process she informed them that she had a reverse prosthesis in her left shoulder which adversely affected her balance and made her unable to walk a straight line. Plaintiff's testimony, however, does not reflect that prior to the officers' initiating the handcuffing she further advised them that the prosthesis also prevented her from being handcuffed behind her back or that handcuffing her in that manner could cause severe pain or injury. It was only after the handcuffing had commenced, which Plaintiff resisted as described above, did Plaintiff so inform them. (*See* Plaintiff's Answer to Defendants' Inter. No. 23; Plaintiff's Dep. at 91). Accordingly, through her testimony Plaintiff has acknowledged that the handcuffing was already underway when she told the deputies that she could not be restrained behind her back due to her shoulder prosthesis. This is similar to the sequence of events described in *Rodriguez II*, where the court observed the police officer was not constitutionally obliged to credit the plaintiff's statement that his arm was injured. *Rodriguez II*, 294 F.3d at 1277, n. 3. Had the statement been made "before the physical part of the arrest began," the court went on to comment that it "would have been more inclined to conclude" that the officer was required to credit the statement. *Id.* Here, there simply is no allegation or evidence that, "before the physical part of the arrest began," either Deputy Bringmans or Deputy Teichner reasonably knew or should have known that a device described by Plaintiff as a reverse shoulder prosthesis which adversely affected her balance would further

render her unable to safely place her arms behind her back. *Rodriguez I*, 280 F.3d at 1352–53 (concluding that hindsight cannot be used to judge police officer's handcuffing suspect but rather the conduct must be judged by considering what the officer knew or reasonably should have known at the time of the act). *See also Lee*, 284 F.3d at 1200 (11th Cir.2002) (quoting and construing *Rodriguez I* ).

Furthermore, based on the circumstances with which the deputies were confronted, it was entirely reasonable for them not to fully credit Plaintiff's statement about her shoulder condition. The BOLO to which the officers had responded was issued for a possible drunk driver, they had observed Plaintiff driving erratically, she had failed to stop for quite a distance despite being followed by two police vehicles with their emergency lights activated, her clothing was disheveled, she had a strong odor of alcohol about her, and her speech was slurred. This evidence was sufficient for a reasonable officer to reach the conclusion, which the deputies obviously in fact did, that Plaintiff was intoxicated. And, based on that conclusion, it was reasonable for the deputies to discount Plaintiff's screamed protests about restrictions caused by her reverse prosthesis.

As a final matter, to the extent Plaintiff claims that the hairline fracture was unrelated to her reverse prosthesis, Plaintiff's allegations suggest the officers used a handcuffing technique which is well within the bounds of "relatively common and ordinarily accepted [non-excessive ways] to detain an arrested." *Rodriguez I*, 280 F.3d at 1351. In fact, when discussing the police officer's manner of handcuffing Rodriguez, which included grabbing his arm, twisting it behind his back, and then jerking the arm upwards to shoulder height, the court described the acceptability of the technique in precisely those terms. *Id.* In

the instant case, Plaintiff does not allege that the officers employed nearly so forceful a maneuver. Furthermore, Plaintiff has put forward no medical evidence which supports that the hairline fracture of her humerus was totally unrelated to the presence of the reverse prosthesis in her left shoulder; rather, the evidence of record tends to suggest the contrary, *i.e.*, that the fracture was thought to be related. In short, neither the allegations nor the evidence suggest that the deputies exerted such force on Plaintiff's left arm that, independent of any pre-existing condition of her shoulder of which the deputies had been advised or reasonably should have been aware, her humerus was fractured.

Based upon the above discussion, the Court concludes that Plaintiff has not shown that the force used was unreasonable such that the constitutional proscription against the use of excessive force was violated. *See Draper*, 369 F.3d at 1277; *see also Vinyard*, 311 F.3d at 1347. The Court's view is not altered by Plaintiff's contention that a genuine issue of material fact for the jury exists with respect to the visibility of her shoulder condition. Plaintiff acknowledges that on December 25, 2002, she was not wearing a cast or sling and that there was no other outward evidence which might have readily indicated to the officers that she had a pre-existing shoulder ailment. (Plaintiff's Dep. at 106). She states, however, that given the "really thin shirt" she was wearing and the natural light which was still present at dusk at 5:30 p.m., there was "no missing" the shape of her shoulder, which she describes as "not there." (*Id.* at 104–05). Viewing this evidence in the light most favorable to Plaintiff, the Court concludes that no genuine issue of material fact exists which would preclude granting summary judgment to Defendants. Even assuming the deputies observed or should have observed a deformity of Plaintiff's left shoulder, no

reasonable inference may be drawn from this fact that either officer therefore knew the full extent of Plaintiff's shoulder condition, specifically that handcuffing her behind her back would seriously aggravate her shoulder problem or cause a hairline fracture of her humerus. *See Rodriguez I*, 280 F.3d at 1353, n. 20 (finding that evidence the plaintiff told police officer he had just gotten out of the hospital after a motorcycle accident, officer scanned medical records, and officer stood in location where he might have seen the plaintiff wearing a sling did not give rise to reasonable inference that the officer knew or should have known about the injured arm and that it required special treatment). Thus the fact that Plaintiff's shoulder may have appeared undersize or misshapen is not "material" as it would not affect the outcome of this suit, and no genuine factual dispute exists because the evidence is not "such that a reasonable jury could return a verdict" for Plaintiff based on it. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

 For the foregoing reasons, the Court concludes that Plaintiff has not demonstrated that her allegations, taken as true, establish a constitutional violation. *Hope*, 536 U.S. at 738, 122 S.Ct. 2508. In an abundance of caution, however, the Court also finds that the deputies should be granted qualified immunity, assuming their conduct did violate Plaintiff's rights. The actions at issue are not so outside the bounds of the constitutional proscription against excessive force that fair and clear warning should be imputed to the deputies. *See Vinyard*, 311 F.3d at 1350–51. Further, the Court is not aware of, nor has Plaintiff pointed to, case law that lends itself to such broad application that the deputies would have had clear and fair warning that their conduct violated Plaintiff's right to be free from the use of excessive force. *Id.* Moreover, even after the *Rodriguez* cases, which do involve a factual situation similar to the one in this case, the contours of the applicable law regarding the handcuffing of a suspect who advises officers of a pre-existing arm condition are not sufficiently settled such that reasonable warning should be inferred. In any event, the Court concludes that the deputies' actions on December 25, 2002, were "not so far beyond the hazy border between excessive and acceptable force that every objectively reasonable officer, facing the circumstances, would have known that the acts violated the pre-existing federal law." *Garrett v. Athens–Clarke County, Georgia*, 378 F.3d 1274, 1281(11th Cir.2004). Thus the Court finds that Deputy Bringmans and Deputy Teichner are entitled to qualified immunity.

In short, for the reasons given above, the Court concludes that the Defendants are entitled to entry of judgment in their favor as a matter of law as to Count I.

*Count II: State Law Battery Claim Against Defendants Hall, Bringmans, and Teichner*

In Count II Plaintiff asserts a state law claim of battery against Sheriff Hall and Deputies Bringmans and Teichner. As previously noted, Plaintiff alleges that the conduct of Deputies Bringmans and Teichner constitutes a battery committed without malice for which, under the doctrine of *respondeat superior*, Sheriff Hall may be held liable. Alternatively, Plaintiff alleges that the deputies' conduct was committed with malice, for which they may be held liable directly.

Because the Court has dismissed Count I, the only claim over which it had original jurisdiction, it declines to exercise supplemental jurisdiction over Count II. Count II shall therefore be dismissed without prejudice. *See Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir.2002).

## *CONCLUSION*

For the reasons stated above, based upon the evidence of record the Court finds that there are no genuine issues of material fact regarding whether Deputy Bringmans and Deputy Teichner violated Plaintiff's constitutional rights or whether they are entitlement to qualified immunity. Thus these Defendants are entitled to judgment as a matter of law as to Count I. There being no remaining federal claims, the Court declines to accept supplemental jurisdiction over Count II.

Accordingly, it is hereby ORDERED:

1. The motion for summary judgment filed by Defendants Hall, Bringmans, and Teichner (doc. 18) is GRANTED.

2. Consistent with this Order the Clerk of Court is directed to enter summary judgment in favor of Defendants Hall, Bringmans, and Teichner. Count I is dismissed with prejudice. Count II is dismissed without prejudice. Plaintiff shall take nothing by this action and hence goes without day.

3. The Clerk of Court is directed to CLOSE this case.